[No. 39487.    En Banc.    April 9, 1970.]

DOROTHY MILES, *Individually and as Administratrix, Respondent,* v. ST. REGIS PAPER COMPANY, INC., *Defendant,* NORTHERN PACIFIC RAILROAD COMPANY, INC., *et al., Appellants.*\*

*Dean H. Eastman, Robert J. Allerdice, Roger J. Crosby,* and *John J. Majeres,* for appellants.

\*Reported in 467 P.2d 307.

*F. G. Enslow* (of *Griffin, Boyle & Enslow*), for respondent.

FINLEY, J.—This lawsuit was brought by Dorothy Miles individually as the surviving wife and as the administratrix of the estate of Claud Miles, Sr., the deceased. Negligence was alleged on the part of the St. Regis Paper Company, Inc., the Northern Pacific Railroad Company, Inc., and certain employees of both entities.

A motion by St. Regis challenging the sufficiency of the evidence at the end of the plaintiff's case was granted and St. Regis is not involved in this appeal. Similar motions by Northern Pacific Railroad at the end of plaintiff's case and at the end of all of the evidence were denied. The jury returned a verdict of $35,000 for the plaintiff. A motion for a judgment n.o.v. or for a new trial was denied and this appeal followed.

Claud Miles, Sr., was crushed and instantly killed by one of three logs which rolled from the top of a flatcar loaded with logs. The flatcar and its load of logs were in a logging train in the process of being unloaded at the premises of the "D" Street Rafting Company, Inc., of Tacoma, Washington.

The logging train was loaded with logs by employees of St. Regis at Lake Kapowsin. Much testimony was introduced tending to show that due care was exercised by St. Regis employees in loading the logs on the flatcars at Lake Kapowsin; furthermore, that subsequent repetitive inspections of the log loads were made both by St. Regis and Northern Pacific to insure safe transportation and safe unloading. After arrival of the log train at the railroad yards in Tacoma, a Northern Pacific switch engine was coupled to it and moved the train from the railroad yards to the premises of the "D" Street Rafting Company. There is a conflict in the evidence as to what happened there. The employees of the railroad testified that the train did not move after the last car in the string was positioned under the crane of the "D" Street Rafting Company in preparation for unload-

ing. They stated that no logs had been unloaded prior to the accident. But, in direct conflict there is the testimony of the operator of the crane at the time of the accident, a Mr. Keblek, who was an employee of "D" Street Rafting Company. He testified that some logs had been unloaded and that the train was moved just 15 or 20 seconds prior to the time he heard the locomotive whistle blow, indicating an accident had occurred.

The testimony of witnesses for the railroad indicated that movement of the train in positioning the cars for unloading was under the control of members of the unloading crew of the "D" Street Rafting Company who relayed signals to the train crew. In conflict, other testimony indicated that movement of the train was subject to control and authority of the train crew, principally the engineer or fireman on duty in the locomotive engine. As will be seen later, this question of control has become the primary issue in this appeal.

Two cables with fasteners or "binders" were placed around each end of each load of logs on the railroad flatcars. Apparently the cables and binders were used at the behest of the railroad as a safety measure and had the capacity to provide some stability for the log loads. The cables were not of sufficient strength to hold if an entire log load shifted significantly. They would resist and contain some shifting as to a load or as to one log, depending upon the size and weight of logs and the shifting involved. Normally the cables would hang somewhat loosely at the bottom of each log load. One method of ascertaining stability and safety of the log loads at the time of unloading was to inspect and determine whether each of the cables and the binders were intact and whether the cables were hanging somewhat loosely beneath each log load. On the day of the accident, Mr. Miles, the deceased, was a member of the unloading crew of the "D" Street Rafting Company. He was assigned the duty of releasing the binders encircling the loads of logs on the flatcars. After releasing the binders, it was part of his work to return to the crane and to assist

in handling two slings which were attached to the crane and utilized in unloading logs. These were passed under and around the loads of logs, then attached to the crane. When each end was secured, the crane was then used to pull the slings tight, and then to lift and unload the logs. At the time of the accident Mr. Miles had not returned to the crane to work with the slings. After the accident it was ascertained that except for the flatcar immediately in front of the switch engine, the binders had been released. One of the binders on the fatal load of logs had been released by hand, ostensibly by Mr. Miles. The other binder had not been released but the cable was broken.

The engineer, Mr. Casey, had changed places in the cab of the switch engine with the fireman and was eating his lunch, sitting with his back to the log load on the flatcar immediately in front of the switch engine. He did not see the three logs roll off the top of the load and did not see Mr. Miles until after the accident when he looked and saw him under one of the logs. The fireman seated by the throttle on the opposite side of the engine cab could not see Mr. Miles. He did see the top or "peaker" log and the other two logs begin to roll from the railroad flatcar. The foreman of the railroad switching crew, Mr. Harper, was on a platform adjacent to the crane, several car lengths distance from the switch engine, and on the side of the train opposite from where Mr. Miles was killed. From his location at the time of the accident, Mr. Harper could not see Mr. Miles. Two other members of the railroad switching crew had temporarily left the log train and had gone to have coffee after the train was initially positioned on the premises of the "D" Street Rafting Company. Obviously they could not see and evaluate the situation of Mr. Miles just prior to the accident. Mr. Keblbek testified that from his position operating the crane he could not see Mr. Miles alongside the fatal load of logs.

There was very positive testimony on the part of members of the railroad switching crew that the train had not been handled roughly in its movement from the railroad

yard to the "D" Street Rafting Company premises; furthermore, that two of these employees had walked the train observing the condition of the binders and carefully inspecting each of the log loads on the several flatcars of the train. There was positive testimony that if an inspection of the binders and the logs showed a possibility that any load of logs was unstable, the suspect loads would be tagged with a white card and the binders and cables would not be released by hand. Such loads would be moved to the crane site and the slings placed around the logs as a safety precaution before the binders would be released.

The appellant assigns error: (1) to the denial of motions attacking the sufficiency of the evidence, (2) to the failure of the trial court to give several jury instructions offered by the appellant, and (3) to the giving of an instruction submitting the doctrine res ipsa loquitur to the jury. We are convinced there was sufficient evidence that the trial court did not err in denying appellant's motions in this regard. We agree with the trial court that it was not error to refuse to give the instructions offered by appellant. The essence of these was adequately covered in other instructions given to the jury. This appeal focuses essentially on whether it was error for the trial court to instruct the jury on the doctrine of res ipsa loquitur.

A common statement of the doctrine of res ipsa loquitur appears in *Kind v. Seattle*, 50 Wn.2d 485, 489, 312 P.2d 811 (1957):

> Where a plaintiff's evidence establishes that an instrumentality under the exclusive control of the defendants caused an injurious occurrence, which ordinarily does not happen if those in control of the instrumentality use ordinary care, there is an inference, permissible from the occurrence itself, that it was caused by the defendant's want of care.

■ The three prerequisites to application of the doctrine are: (1) an event which ordinarily does not occur unless someone is negligent; (2) the agency or instrumentality causing the event must be within the exclusive control of the defendant; and (3) there must be no voluntary

action or contribution to the event on the part of the plaintiff. *Douglas v. Bussabarger,* 73 Wn.2d 476, 438 P.2d 829 (1968); *Emerick v. Mayr,* 39 Wn.2d 23, 234 P.2d 1079 (1951); W. Prosser, Torts § 42, at 208 (2d ed. 1955). It is a well known fact that great quantities of logs are loaded, transported, and unloaded every day throughout the state by truck and rail facilities. It is also well known that in most substantial part logs are loaded, transported, and unloaded properly, safely, and without accidents. So, despite the occurrence of some accidents, as in the instant case, we are convinced it can be said that they do not happen unless there has been some negligence on the part of someone involved in loading, transporting, or unloading the logs.

The question of control poses a close and difficult problem. Appellant makes a strong argument that employees of "D" Street Rafting Company had exclusive control of not only the unloading of the logs involving the use of the crane, but also other operations, including positioning of the cars and movement of the train. There is conflicting testimony, and the hand on the throttle of the switch engine was obviously the hand of the engineer or the fireman (employees of the railroad). Furthermore, any movement of the train ultimately was the responsibility and within the exclusive control of such employees. It is not denied that movement of the train and positioning of the railroad flatcars loaded with logs occurred in accordance with the unloading plans and desires of employees of "D" Street Rafting Company, communicated by hand signal or otherwise to the foreman of the railroad switching crew and relayed by him to the engine crew. We believe that the ultimate decision to move the train was made by employees of the railroad. Thus, *in terms of the requisites for application of res ipsa loquitur in this case,* we are convinced that at the time of the accident the train of flatcars loaded with logs was in the "exclusive control" of the railroad.

It is not of crucial consequence that Mr. Miles apparently released the binder at one end of the load of logs shortly before the accident. There was evidence that a load of logs

834

could be stable at one end and not at the other end. The jury could have inferred from this evidence that the fatal log load was unstable at the end where the cable had snapped, but stable at the end where the binder had been released. There was evidence that a binder could not be released by hand when the weight of a log put tension on a cable and binder. In this respect there was evidence tending to show that a load of logs could be made unstable by rough or jerky movement of the train either before or after a binder had been released. In addition, this lack of stability apparently would not always be shown by a taut or snapped binder until it was too late. We are convinced that the evidence supports the conclusion that Mr. Miles did not contribute to the log's fall.

Without Mr. Keblbek's testimony that the train was moved 15 to 20 seconds prior to the time that the three logs spilled or rolled off of the flatcar, there would indeed be a more difficult question as to any possible inference of negligence on the part of the railroad. However, on the basis of the evidence brought out at the trial, we cannot say that the instruction on res ipsa loquitur was error.

■ Indeed this case seems to us to have a classic similarity to *Byrne v. Boadle*, 159 Eng. Rep. 299 (1863), which originated application of the *doctrine of res ipsa loquitur*. There it was a barrel of flour which mysteriously fell on plaintiff; here it was a log. In that case the learned judge stated "the plaintiff who was injured by [the falling barrel] is not bound to shew that it could not fall without negligence, but if there are any facts inconsistent with negligence it is for the defendant to prove them." *Byrne v. Boadle, supra*. We have continually adhered to this approach. *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.*, 62 Wn.2d 351, 382 P.2d 518 (1963). We believe the doctrine is applicable under the circumstances in this case.

The judgment of the trial court should be affirmed. It is so ordered.

HUNTER, C. J., ROSELLINI, HAMILTON, and HALE, JJ., concur.

NEILL, J. (dissenting)—I am in disagreement with the majority on its conclusion that the res ipsa loquitur instruction (No. 5) was properly given. There was insufficient evidence to support the instruction and the instruction was not a correct statement of the doctrine.

It is uncontested that, absent res ipsa loquitur, the plaintiff's evidence is insufficient to establish a prima facie case. One of the prerequisites to application of the doctrine of res ipsa loquitur is that the instrumentality causing the event must be within the exclusive control of the defendant. The majority finds sufficient evidence of exclusive control to justify application of the doctrine. I disagree.

Three members of the train crew, the "D" Street crew foreman and the resident manager of "D" Street Rafting Company all substantially agreed in their testimony on the normal practices followed in these unloading operations. The switch engine would spot the first car under the unloading crane. No further movement of the train would occur until directed by employees of the rafting company. Instructions to move the cars would be given to the switchman standing at the end of the train near the unloading platform, who would relay them by hand signals to the engineer at the other end of the train.

The three railroad company employees who were present at the time of the accident all testified that the train was originally positioned so that the car farthest from the engine was under the crane. The train was not moved and none of the cars were unloaded until after the accident, which occurred 5 to 10 minutes after they had positioned the first car. However, Mr. Keblbek, a boom man for the rafting company, testified that one car had been unloaded and that the train had been moved immediately prior to the accident. He also testified, contrary to the later testimony of his manager, Mr. Reid, that sometimes the railroad crew was aware of the sequence in which the cars were to be unloaded and that each movement of the train might not be in direct response to individual commands given by rafting company employees. In this specific instance, Mr. Keblbek

could not say who gave the instructions to move the train.

"Control" does not necessarily mean actual physical control, but can include the present ability to exercise a right of control. *See Hogland v. Klein,* 49 Wn.2d 216, 298 P.2d 1099 (1956); *Edwards v. A.F.J. Distributors, Inc.,* 58 Wn.2d 789, 364 P.2d 952 (1961). All the witnesses agreed that once the train arrived at "D" Street Rafting Company, the unloading process was essentially directed by employees of that company. While it is true that the hand on the throttle of the switch engine remained that of a railroad employee, and while it may also be true that the engineer had a legal right to refuse to follow any instructions from employees of the rafting company, it does not follow that the railroad so controlled the unloading process that any negligence occurring therein may be automatically attributible to it. Even Mr. Keblbek, who testified that the engine moved immediately before the accident, cannot say who ordered this movement; and he specifically admitted that the engine may have moved under instructions from him or Mr. Reid, both employees of the rafting company. Under these circumstances, I see no basis for the majority's conclusion that the train was in the "exclusive control" of the railroad at the time of the accident. *See Morner v. Union Pac. R. R.,* 31 Wn.2d 282, 196 P.2d 744 (1948).

As we noted in *Vogreg v. Shepard Ambulance Serv., Inc.,* 47 Wn.2d 659, 289 P.2d 350 (1955), no special witchcraft is invoked by murmuring the Latin phrase, "res ipsa loquitur." The doctrine is nothing more than a legal formulation of the common sense conclusion that if an instrumentality for which defendant is responsible injures somebody, and this injury would not normally occur without negligence, then defendant is responsible for the injury. But when, as here, the evidence does not establish exclusive control in the defendant, and the possible causes include negligence by others as well as the defendant, or causes involving no negligence at all, then the doctrine does not apply. Therefore, it was error to instruct the jury on the doctrine of res ipsa loquitur. The case should have been dismissed upon defendant's motion at the close of the evidence.

Instruction No. 5, to which defendant took exception, reads in relevant part:

[Y]ou are instructed that it is for you to determine whether the manner of occurrence of the death of Claud Miles and the attendant circumstances connected therewith are of such character as would, in your judgment, warrant an inference that the injury would not have occurred had due diligence and care been exercised by the defendant's employees.

The rule is that when an agency or instrumentality which produces injury is under the control of a defendant or its employees, and the injury which occurred would ordinarily not have resulted if those in control had used proper care, then, in the absence of satisfactory explanation, you are at liberty to infer though you are not required to infer that the defendant, or its employees, were at some point negligent and that such negligence produced the death of Claud Miles.

My concern is with the words "under the control of a defendant or its employees." These words do not specify for the jury the degree of control (exclusive) that is necessary before res ipsa can be applied. As instructed, the jury could have subjected defendant to the effects of the doctrine upon a finding that defendant had partial control, potential partial control, or any of the other myriad degrees of control ranging from the almost exclusive to the almost nil. If such an instruction is to be given at all,[1] it should be given accurately. Here, the instruction is deficient in that it allows the jury to apply the doctrine upon a finding that defendant had *any* degree of control over the instrumentality. The instruction is plainly erroneous.

---

[1]A strong argument may be posited against the giving of res ipsa instructions in any case. Since the function of the doctrine is to surmount a nonsuit, the purpose is fulfilled when the matter is given over to the jury. To add a special instruction on the res ipsa inference is to give that possible inference an unfair advantage over other possible inferences in the case. *See Provins v. Bevis*, 70 Wn.2d 131, 140, 422 P.2d 505 (1967). The Washington Supreme Court Committee on Jury Instructions has accepted this view, and recommends that no instruction be given on res ipsa loquitur. 6 Wash. Prac., WPI 22.01, at 131 (1967). I do not reach the question of the continuing validity of such instructions as that issue has not been raised in this case.

I would reverse and dismiss.

WEAVER and McGOVERN, JJ., concur with NEILL, J.

May 27, 1970. Petition for rehearing denied.

*Reported in 467 P.2d 284.