[No. 41696.    En Banc.    November 15, 1972.]

MRS. JACOB SIEGLER, *Individually and as Administratrix, Petitioner,* v. AARON L. KUHLMAN *et al., Respondents.*

*Fristoe, Taylor & Schultz, P.S., E. Robert Fristoe, Don W. Taylor,* and *Theodore D. Schultz,* for petitioner.

*Davies, Pearson, Anderson & Gadbow,* by *Alvin A. Anderson,* for respondents.

HALE, J.—Seventeen-year-old Carol J. House died in the flames of a gasoline explosion when her car encountered a pool of thousands of gallons of spilled gasoline. She was driving home from her after-school job in the early evening of November 22, 1967, along Capitol Lake Drive in Olympia; it was dark but dry; her car's headlamps were burning. There was a slight impact with some object, a muffled explosion, and then searing flames from gasoline pouring out of an overturned trailer tank engulfed her car. The result of the explosion is clear, but the real causes of what happened will remain something of an eternal mystery.

Aaron L. Kuhlman had been a truck driver for nearly 11 years after he completed the 10th grade in high school and after he had worked at other jobs for a few years. He had been driving for Pacific Intermountain Express for about 4 months, usually the night shift out of the Texaco bulk plant in Tumwater. That evening of November 22nd, he was scheduled to drive a gasoline truck and trailer unit, fully

loaded with gasoline, from Tumwater to Port Angeles. Before leaving the Texaco plant, he inspected the trailer, checking the lights, hitch, air hoses and tires. Finding nothing wrong, he then set out, driving the fully loaded truck tank and trailer tank, stopping briefly at the Trail's End Cafe for a cup of coffee. It was just a few minutes after 6 p.m., and dark, but the roads were dry when he started the drive to deliver his cargo—3,800 gallons of gasoline in the truck tank and 4,800 gallons of gasoline in the trailer tank. With all vehicle and trailer running lights on, he drove the truck and trailer onto Interstate Highway 5, proceeded north on that freeway at about 50 miles per hour, he said, and took the offramp about 1 mile later to enter Highway 101 at the Capitol Lake interchange. Running downgrade on the offramp, he felt a jerk, looked into his left-hand mirror and then his right-hand mirror to see that the trailer lights were not in place. The trailer was still moving but leaning over hard, he observed, onto its right side. The trailer then came loose. Realizing that the tank trailer had disengaged from his tank truck, he stopped the truck without skidding its tires. He got out and ran back to see that the tank trailer had crashed through a chain-link highway fence and had come to rest upside down on Capitol Lake Drive below. He heard a sound, he said, "like somebody kicking an empty fifty-gallon drum and that is when the fire started." The fire spread, he thought, about 100 feet down the road.

The trailer was owned by defendant Pacific Intermountain Express. It had traveled about 329,000 miles prior to November 22, 1967, and had been driven by Mr. Kuhlman without incident down the particular underpass above Capitol Lake Drive about 50 times. When the trailer landed upside down on Capitol Lake Drive, its lights were out, and it was unilluminated when Carol House's car in one way or another ignited the spilled gasoline.

Carol House was burned to death in the flames. There was no evidence of impact on the vehicle she had driven,

Kuhlman said, except that the left front headlight was broken.

Why the tank trailer disengaged and catapulted off the freeway down through a chain-link fence to land upside down on Capitol Lake Drive below remains a mystery. What caused it to separate from the truck towing it, despite many theories offered in explanation, is still an enigma. Various theories as to the facts and cause were advanced in the trial. Plaintiff sought to prove both negligence on the part of the driver and owner of the vehicle and to bring the proven circumstances within the res ipsa loquitur doctrine. Defendants sought to obviate all inferences of negligence and the circumstances leading to the application of res ipsa loquitur by showing due care in inspection, maintenance and operation. Plaintiff argued negligence per se and requested a directed verdict on liability. On appeal, plaintiff relied in part on RCW 46.44.070 and RCW 46.61.655,[1] relating to the drawbar connecting trailer to truck, and provisions prohibiting a load from dropping, shifting, leaking or escaping from the vehicle.

The jury apparently found that defendants had met and overcome the charges of negligence. Defendants presented proof that both the truck, manufactured by Peterbilt, a division of Pacific Car and Foundry Company, and the tank and trailer, built by Fruehauf Company, had been constructed by experienced companies, and that the fifth wheel, connecting the two units and built by Silver Eagle

[1]RCW 46.44.070 reads in part as follows:

"The drawbar or other *connection* between vehicles in combination *shall be of sufficient strength* to hold the weight of the towed vehicle on any grade where operated. *No trailer shall* whip, weave or oscillate or *fail to follow substantially in the course* of the towing vehicle." (Italics ours.)

RCW 46.61.655 reads in part as follows:

"*No vehicle shall be driven or moved on any public highway unless* such vehicle is so *constructed or loaded as to prevent any of its load from* dropping, sifting, leaking or otherwise *escaping therefrom,* except that sand may be dropped for the purpose of securing traction, or water or other substance may be sprinkled on a roadway in the cleaning or maintaining of such roadway by public authority having jurisdiction." (Italics ours.)

Company, was the type of connecting unit used by 95 percent of the truck-trailer units. Defendants presented evidence that a most careful inspection would not have revealed the defects or fatigue in the metal connections between truck and trailer; that the trailer would not collapse unless both main springs failed; there was evidence that, when fully loaded, the tank could not touch the wheels of the tank trailer without breaking the springs because the maximum flexion of the springs was less than 1 inch. Defendants presented evidence that the drawbar was secure and firmly attached; that the tanks were built of aluminum to prevent sparks; and that, when fully loaded with 4,800 gallons of cargo, there would be 2 or 3 inches of space between the cargo and top of the tank; that two safety cables connected the two units; that the truck and trailer were regularly serviced and repaired, and records of this preserved and put in evidence; that the unit had been subject to Interstate Commerce Commission spot checks and conformed to ICC standards; and that, at the time of the accident, the unit had traveled less than one-third of the average service life of that kind of unit. There was evidence obtained at the site of the fire that both of the mainsprings above the tank trailer's front wheels had broken as a result of stress, not fatigue—from a kind of stress that could not be predicted by inspection—and finally that there was no negligence on the driver's part.

Defendants also presented some evidence of contributory negligence on the basis that Carol House, driving on a 35-mile-per-hour road, passed another vehicle at about 45 miles per hour and although she slacked speed somewhat before the explosion, she was traveling at the time of the impact in excess of the 35-mile-per-hour limit. The trial court submitted both contributory negligence and negligence to the jury, declared the maximum speed limit on Capitol Lake Drive to be 35 miles per hour, and told the jury that, although violation of a positive statute is negligence as a matter of law, it would not engender liability unless the violation proximately contributed to the injury.

From a judgment entered upon a verdict for defendants, plaintiff appealed to the Court of Appeals which affirmed. 3 Wn. App. 231, 473 P.2d 445 (1970). We granted review (78 Wn.2d 991 (1970)), and reverse.

In the Court of Appeals, the principal claim of error was directed to the trial court's refusal to give an instruction on res ipsa loquitur, and we think that claim of error well taken. Our reasons for ruling that an instruction on res ipsa loquitur should have been given and that an inference of negligence could have been drawn from the event are found, we believe, in our statements on the subject: *Ze-Barth v. Swedish Hosp. Medical Center*, 81 Wn.2d 12, 499 P.2d 1 (1972); *Miles v. St. Regis Paper Co.*, 77 Wn.2d 828, 467 P.2d 307 (1970); *Douglas v. Bussabarger*, 73 Wn.2d 476, 438 P.2d 829 (1968); *Pederson v. Dumouchel*, 72 Wn.2d 73, 431 P.2d 973 (1967). We think, therefore, that plaintiff was entitled to an instruction permitting the jury to infer negligence from the occurrence.

But there exists here an even more impelling basis for liability in this case than its derivation by allowable inference of fact under the res ipsa loquitur doctrine, and that is the proposition of strict liability arising as a matter of law from all of the circumstances of the event.

Strict liability is not a novel concept; it is at least as old as *Fletcher v. Rylands*, L.R. 1 Ex. 265, 278 (1866), *aff'd*, House of Lords, 3 H.L. 330 (1868). In that famous case, where water impounded in a reservoir on defendant's property escaped and damaged neighboring coal mines, the landowner who had impounded the water was held liable without proof of fault or negligence. Acknowledging a distinction between the natural and nonnatural use of land, and holding the maintenance of a reservoir to be a nonnatural use, the Court of Exchequer Chamber imposed a rule of strict liability on the landowner. The ratio decidendi included adoption of what is now called *strict liability*, and at page 278 announced, we think, principles which should be applied in the instant case:

[T]he person who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril, and, if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape.

All of the justices in *Fletcher v. Rylands, supra,* did not draw a distinction between the natural and nonnatural use of land, but such a distinction would, we think, be irrelevant to the transportation of gasoline. The basic principles supporting the *Fletcher* doctrine, we think, control the transportation of gasoline as freight along the public highways the same as it does the impounding of waters and for largely the same reasons. *See* Prosser, *Torts* § 78 (4th ed. 1971).

In many respects, hauling gasoline as freight is no more unusual, but more dangerous, than collecting water. When gasoline is carried as cargo—as distinguished from fuel for the carrier vehicle—it takes on uniquely hazardous characteristics, as does water impounded in large quantities. Dangerous in itself, gasoline develops even greater potential for harm when carried as freight—extraordinary dangers deriving from sheer quantity, bulk and weight, which enormously multiply its hazardous properties. And the very hazards inhering from the size of the load, its bulk or quantity and its movement along the highways presents another reason for application of the *Fletcher v. Rylands, supra,* rule not present in the impounding of large quantities of water—the likely destruction of cogent evidence from which negligence or want of it may be proved or disproved. It is quite probable that the most important ingredients of proof will be lost in a gasoline explosion and fire. Gasoline is always dangerous whether kept in large or small quantities because of its volatility, inflammability and explosiveness. But when several thousand gallons of it are allowed to spill across a public highway—that is, if, while in transit as freight, it is not kept impounded—the hazards to third persons are so great as to be almost beyond calculation. As a consequence of its escape from impoundment

and subsequent explosion and ignition, the evidence in a very high percentage of instances will be destroyed, and the reasons for and causes contributing to its escape will quite likely be lost in the searing flames and explosions.

That this is a sound case for the imposition of a rule of strict liability finds strong support in Professor Cornelius J. Peck's analysis in *Negligence and Liability Without Fault in Tort Law*, 46 Wash. L. Rev. 225 (1971). Pointing out that strict liability was imposed at common law prior to *Fletcher v. Rylands, supra,* that study shows the application of a rule of strict liability in a number of instances, *i.e.,* for harm done by trespassing animals; on a bona fide purchaser of stolen goods to their true owner; on a bailee for the misdelivery of bailed property regardless of his good faith or negligence; and on innkeepers and hotels at common law. But there are other examples of strict liability: The Supreme Court of Minnesota, for example, imposed liability without fault for damage to a dock inflicted by a ship moored there during a storm. *Vincent v. Lake Erie Transp. Co.,* 109 Minn. 456, 124 N.W. 221 (1910).

The rule of strict liability rests not only upon the ultimate idea of rectifying a wrong and putting the burden where it should belong as a matter of abstract justice, that is, upon the one of the two innocent parties whose acts instigated or made the harm possible, but it also rests on problems of proof:

One of these common features is that the person harmed would encounter a difficult problem of proof if some other standard of liability were applied. For example, the disasters caused by those who engage in abnormally dangerous or extra-hazardous activities frequently destroy all evidence of what in fact occurred, other than that the activity was being carried on. Certainly this is true with explosions of dynamite, large quantities of gasoline, or other explosives. It frequently is the case with falling aircraft. Tracing the course followed by gases or other poisons used by exterminators may be difficult if not impossible. The explosion of an atomic reactor may leave little evidence of the circumstances which caused it. Moreover, application of such a standard of liability to

activities which are not matters of common experience is well-adapted to a jury's limited ability to judge whether proper precautions were observed with such activities.

Problems of proof which might otherwise have been faced by shippers, bailors, or guests at hotels and inns certainly played a significant role in shaping the strict liabilities of carriers, bailees, and innkeepers. Problems of proof in suits against manufacturers for harm done by defective products became more severe as the composition and design of products and the techniques of manufacture became less and less matters of common experience; this was certainly a factor bringing about adoption of a strict liability standard.

(Footnote omitted.) C. Peck, *Negligence and Liability Without Fault in Tort Law,* 46 Wash. L. Rev. 225, 240 (1971).

*See also,* G. P. Fletcher, *Fairness and Utility in Tort Theory,* 85 Harv. L. Rev. 537 (1972), for an analysis of the judicial philosophy relating to tort liability as affecting or affected by concepts of fault and negligence; and Comment, *Liability Without Fault: Logic and Potential of a Developing Concept,* 1970 Wis. L. Rev. 1201.

■  Thus, the reasons for applying a rule of strict liability obtain in this case. We have a situation where a highly flammable, volatile and explosive substance is being carried at a comparatively high rate of speed, in great and dangerous quantities as cargo upon the public highways, subject to all of the hazards of high-speed traffic, multiplied by the great dangers inherent in the volatile and explosive nature of the substance, and multiplied again by the quantity and size of the load. Then we have the added dangers of ignition and explosion generated when a load of this size, that is, about 5,000 gallons of gasoline, breaks its container and, cascading from it, spreads over the highway so as to release an invisible but highly volatile and explosive vapor above it.

Danger from great quantities of gasoline spilled upon the public highway is extreme and extraordinary, for any spark, flame or appreciable heat is likely to ignite it. The

incandescent filaments from a broken automobile headlight, a spark from the heat of a tailpipe, a lighted cigarette in the hands of a driver or passenger, the hot coals from a smoker's pipe or cigar, and the many hot and sparking spots and units of an automobile motor from exhaust to generator could readily ignite the vapor cloud gathered above a highway from 5,000 gallons of spilled gasoline. Any automobile passing through the vapors could readily have produced the flames and explosions which killed the young woman in this case and without the provable intervening negligence of those who loaded and serviced the carrier and the driver who operated it. Even the most prudent and careful motorist, coming unexpectedly and without warning upon this gasoline pool and vapor, could have driven into it and ignited a holocaust without knowledge of the danger and without leaving a trace of what happened to set off the explosion and light the searing flames.

Stored in commercial quantities, gasoline has been recognized to be a substance of such dangerous characteristics that it invites a rule of strict liability—even where the hazard is contamination to underground water supply and not its more dangerous properties such as its explosiveness and flammability. *See Yommer v. McKenzie,* 255 Md. 220, 257 A.2d 138 (1969). It is even more appropriate, therefore, to apply this principle to the more highly hazardous act of transporting it as freight upon the freeways and public thoroughfares.

Recently this court, while declining to apply strict liability in a particular case, did acknowledge the suitability of the rule in a proper case. In *Pacific Northwest Bell Tel. Co. v. Port of Seattle,* 80 Wn.2d 59, 491 P.2d 1037 (1971), we observed that strict liability had its beginning in *Fletcher v. Rylands, supra,* but said that it ought not be applied in a situation where a bursting water main, installed and maintained by the defendant Port of Seattle, damaged plaintiff telephone company's underground wires. There the court divided—not on the basic justice of a rule of strict liability in some cases—but in its application in a particular case to

what on its face was a situation of comparatively minor hazards. Both majority and dissenting justices held, however, that the strict liability principles of *Fletcher v. Rylands, supra,* should be given effect in some cases; but the court divided on the question of whether underground water mains there constituted such a case.

The rule of strict liability, when applied to an abnormally dangerous activity, as stated in the Restatement (Second) of Torts § 519 (Tent. Draft No. 10, 1964), was adopted as the rule of decision in this state in *Pacific Northwest Bell Tel. Co. v. Port of Seattle, supra* at 64, as follows:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent such harm.
> (2) Such strict liability is limited to the kind of harm, the risk of which makes the activity abnormally dangerous.

As to what constitutes an abnormal activity, section 520 states:

> In determining whether an activity is abnormally dangerous, the following factors are to be considered:
> (a) Whether the activity involves a high degree of risk of some harm to the person, land or chattels of others;
> (b) Whether the gravity of the harm which may result from it is likely to be great;
> (c) Whether the risk cannot be eliminated by the exercise of reasonable care;
> (d) Whether the activity is not a matter of common usage;
> (e) Whether the activity is inappropriate to the place where it is carried on; and
> (f) The value of the activity to the community.

Applying these factors to this system, we do not find the activity to be abnormally dangerous. There has never been a break in the system before, absent an earthquake, and the pipe could have been expected to last many more years. It is a system commonly used for fire protection, and its placement underground is, of course, appropriate. We do not find section 519 of the Restatement (Tent.

Draft No. 10, 1964), or *Rylands v. Fletcher, supra,* applicable.

It should be noted from the above language that we rejected the application of strict liability in *Pacific Northwest Bell Tel. Co. v. Port of Seattle, supra,* solely because the installation of underground water mains by a municipality was not, under the circumstances shown, an abnormally dangerous activity. Had the activity been found abnormally dangerous, this court would have applied in that case the rule of strict liability.

Contrast, however, the quiet, relatively safe, routine procedure of installing and maintaining and using underground water mains as described in *Pacific Northwest Bell Tel. Co. v. Port of Seattle, supra,* with the activity of carrying gasoline as freight in quantities of thousands of gallons at freeway speeds along the public highway and even at lawful lesser speeds through cities and towns and on secondary roads in rural districts. In comparing the quiescence and the passive job of maintaining underground water mains with the extremely heightened activity of carrying nearly 5,000 gallons of gasoline by truck, one cannot escape the conclusion that hauling gasoline as cargo is undeniably an abnormally dangerous activity and on its face possesses all of the factors necessary for imposition of strict liability as set forth in the Restatement (Second) of Torts § 519 (Tent. Draft No. 10, 1964), above.

Transporting gasoline as freight by truck along the public highways and streets is obviously an activity involving a high degree of risk; it is a risk of great harm and injury; it creates dangers that cannot be eliminated by the exercise of reasonable care. That gasoline cannot be practicably transported except upon the public highways does not decrease the abnormally high risk arising from its transportation. Nor will the exercise of due and reasonable care assure protection to the public from the disastrous consequences of concealed or latent mechanical or metallurgical defects in the carrier's equipment, from the negligence of third parties, from latent defects in the highways and

streets, and from all of the other hazards not generally disclosed or guarded against by reasonable care, prudence and foresight. Hauling gasoline in great quantities as freight, we think, is an activity that calls for the application of principles of strict liability.

The case is therefore reversed and remanded to the trial court for trial to the jury on the sole issue of damages.

HAMILTON, C.J., FINLEY, ROSELLINI, and HUNTER, JJ., and RYAN, J. Pro Tem., concur.

ROSELLINI, J. (concurring)—I agree with the majority that the transporting of highly volatile and flammable substances upon the public highways in commercial quantities and for commercial purposes is an activity which carries with it such a great risk of harm to defenseless users of the highway, if it is not kept contained, that the common-law principles of strict liability should apply. In my opinion, a good reason to apply these principles, which is not mentioned in the majority opinion, is that the commercial transporter can spread the loss among his customers—who benefit from this extrahazardous use of the highways. Also, if the defect which caused the substance to escape was one of manufacture, the owner is in the best position to hold the manufacturer to account.

I think the opinion should make clear, however, that the owner of the vehicle will be held strictly liable only for damages caused when the flammable or explosive substance is allowed to escape without the apparent intervention of any outside force beyond the control of the manufacturer, the owner, or the operator of the vehicle hauling it. I do not think the majority means to suggest that if another vehicle, negligently driven, collided with the truck in question, the truck owner would be held liable for the damage. But where, as here, there was no outside force which caused the trailer to become detached from the truck, the rule of strict liability should apply.

It also is my opinion that the legislature has expressed an intent that owners and operators of vehicles carrying trail-

ers should be required to keep them under control, and that intent can be found in the statutes cited in the majority opinion. Thus the application of the common-law principles of strict liability is in accord with the manifest legislative view of the matter.

It also should be remarked, I think, that there was in this case no evidence that the alleged negligence of the deceased, in driving faster than the posted speed, was in any sense a proximate cause of the tragedy which befell her. There was no showing that, had she been proceeding at the legal rate of speed, she could have stopped her vehicle in time to avoid being enveloped in the flames or that the gasoline would not have ignited. Thus we are not confronted in this case with a question whether contributory negligence might under some circumstances be a defense to an action of this kind. It should be understood that the court does not pass upon that question at this time.

HAMILTON, C.J., FINLEY, J., and RYAN, J. Pro Tem., concur with ROSELLINI, J.

NEILL, J. (dissenting)—The application of the doctrine of strict liability to the facts of this case is warranted, at least as the applicability is qualified by the concurring opinion of Justice Rosellini. However, to decide this case on that theory violates our established rules of appellate review. *National Indem. Co. v. Smith-Gandy, Inc.,* 50 Wn.2d 124, 309 P.2d 742 (1957); *State v. McDonald,* 74 Wn.2d 474, 445 P.2d 345 (1968).

Plaintiff seeks money redress for the death of an exemplary young woman whose life was horribly terminated in a tragic accident. A jury absolved the defendants from culpability. Irrespective of our sympathy, that jury verdict must stand unless error was committed at the trial. On appeal, the Court of Appeals affirmed the verdict and judgment. *Siegler v. Kuhlman,* 3 Wn. App. 231, 473 P.2d 445 (1970). We granted review. 78 Wn.2d 991 (1970).

The only issue brought to this court by the appeal is the procedural effect of res ipsa loquitur. Before discussing that

462

issue, I will address other portions of the majority and concurring opinions with which I am in disagreement.

The injection of the issue of the applicability and construction of RCW 46.44.070 is improper. The issue was not raised at trial, nor in the Court of Appeals. Following the granting of a petition for review, this court, sua sponte, requested counsel to submit supplemental briefs as to the statute. This is an appellate procedure to which I have previously expressed my dissent. *Maynard Inv. Co. v. McCann*, 77 Wn.2d 616, 625, 465 P.2d 657 (1970).[2] My disagreement with such judicial usurpation of an adversary function is even stronger here, where the meaning ascribed to the statute in focus depends upon an interpretation which that statute has not heretofore received. The majority opinion assumes that the language of RCW 46.44.070 requiring the trailer "connection . . . [to] be of sufficient strength to hold the weight of the towed vehicle on any grade where operated" applies to situations where the trailer breaks away to the side of the towing vehicle. Whether or not that interpretation should be applied to the statute is a question that should await a case where the issue is timely and properly presented.

Further, RCW 46.44.070, even as read by the majority, cannot be applied here without first assuming as fact that the connection was not secure. In this case that assumption is an inappropriate trespass on the jury's function. As the majority notes, the question of whether the connection came loose because improperly secured is raised by circumstantial evidence. In fact, much of the trial was directed to expert testimony as to whether the trailer connection first came loose or whether the breaking of a supporting spring caused the ultimate separation of the connection. Thus any answer to that question is properly the subject of the jury's

---

[2] Both the majority and dissenting opinions in *Maynard Inv. Co. v. McCann*, 77 Wn.2d 616, 625, 465 P.2d 657 (1970), recognize several exceptions to the general rule that appellate courts will not consider a theory or issue which was not presented by the litigants. *See generally* 5 Am. Jur. 2d *Appeal and Error* §§ 545-552. However, none of these exceptions justify the injection of these issues by this court in this case.

consideration from the evidence and reasonable inference from the circumstantial evidence. Unless we are prepared to hold that the statute makes the operator of a truck and tractor rig a guarantor of the security of the connection under all circumstances, we cannot state that the answer is a matter of certitude.

The jury was instructed on contributory negligence. No exception was taken nor has error been assigned to the instruction. Yet, the concurring opinion, sua sponte, questions the giving of the instruction. It has been my understanding that an instruction to which error is not assigned becomes the law of the case. *E.g., Kindelspire v. Lawrence,* 44 Wn.2d 722, 270 P.2d 477 (1954); *Ralston v. Vessey,* 43 Wn.2d 76, 260 P.2d 324 (1953). I think it beyond the proper scope of appellate review to "try the case" for the parties.

I turn to the sole and only assignment of error presented to us: that the jury should have been given one of two res ipsa loquitur instructions proposed by plaintiff. The applicability of that doctrine to the facts of this case is not contested and is not in issue here. The question is the procedural effect to be given that doctrine in the case at hand. I disagree with the treatment that the majority has given to this question and adhere to the lead opinion in *Zukowsky v. Brown,* 79 Wn.2d 586, 488 P.2d 269 (1971). First, the majority opinion chooses to ignore, rather than grapple with, the serious and difficult problems associated with the question of the procedural effect to be given res ipsa loquitur. *See Zukowsky v. Brown, supra,* and authorities therein cited. *Also see Siegler v. Kuhlman,* 3 Wn. App. 231, 473 P.2d 445 (1970). In consequence, the majority decision, as to this point, contributes nothing to the body of law, and yields only a *sui generis* result. Having refused to meet the problem, the majority cannot be read as either enhancing, diminishing, or altering answers arrived at in cases where the issue has been met.[3]

---

[3]In this respect, the Court of Appeals commendably met and discussed the problem. *Siegler v. Kuhlman,* 3 Wn. App. 231, 240-44, 473 P.2d 445 (1970).

∴ In addition, plaintiff's proposed instructions on res ipsa were defective. Each proposed instruction contains language criticized in *Clark v. Icicle Irrigation Dist.*, 72 Wn.2d 201, 203, 432 P.2d 541 (1967):

We particularly disagree with the statement that "the happening of the accident alone affords reasonable evidence . . . that the accident arose from the want of reasonable care." We have been at some pains to make it clear that the happening does not afford "reasonable evidence"; that it does no more than permit the jury to infer, though it is not required to so infer, that the defendant or its agents were at some point negligent.

See recent discussion in *Pederson v. Dumouchel*, [72 Wn.2d 73], 431 P.2d 973 (1967).

Plaintiff's first assignment of error is the trial court's failure to give a requested instruction stating:

You are instructed that when a thing which causes an injury to another is shown to be under the management and control of the person charged with negligence in operation or maintenance of such thing, or in the failure to keep it in a reasonably safe condition, and if it is shown that an accident happened, which in the ordinary course of things, does not happen if those in charge of the management and maintenance of thing exercised reasonable care, then *the happening of the accident alone affords reasonable evidence* in the absence of explanation by the person charged with negligence *that the accident arose from want of reasonable care* on the part of such persons.

(Italics mine.)

Plaintiff's second, and only other, assignment of error is the failure to give an instruction stating:

You are instructed that when an object which causes an injury to another is shown to be under the management and control of a person charged with negligence in the operation of such thing, or in the failure to keep it in a reasonably safe condition and if it is shown that the incident happened which in the ordinary course of things does not happen, if those in charge of this management and control exercise reasonable care, then *the happening of said occurrence affords reasonable evidence,* in the

absence of an explanation by the person charged with negligence, *that the occurrence arose from the want of reasonable care* on the part of such person.

(Italics mine.)

Thus plaintiff's proposed res ipsa instructions were defective by including the "affords reasonable evidence" language criticized in *Clark*.[4] A trial court need not give an erroneous instruction. *State v. Wilson*, 26 Wn.2d 468, 174 P.2d 553 (1946).

I would affirm the trial court and the Court of Appeals.

STAFFORD, J., concurs with NEILL, J.

Petition for rehearing denied January 4, 1973.

---

[4]This distinction between evidence and inference is supported by eminent writers in the field. *E.g.*, Wigmore, *Evidence* (3d ed. 1940) § 1(b), "Argument and Evidence, distinguished," and § 30.