Argued May 12, 1969, reversed and remanded for further
proceedings April 8, 1970

McLANE, *Appellant, v.* NORTHWEST
NATURAL GAS COMPANY,
*Respondent.*
467 P. 2d 635

*William E. Hurley,* Portland, argued the cause for

appellant. With him on the brief were Bernard & Hurley, Portland.

*C. Anderson Griffith,* Portland, argued the cause for respondent. With him on the brief were McMenamin, Blyth, Jones & Joseph, Portland.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN,* and HOLMAN, Justices.

HOLMAN, J.

This is an action for damages for wrongful death brought by the administratrix of decedent's estate for the benefit of decedent's widow and minor children. Plaintiff appealed from a judgment in favor of defendant which was entered after a demurrer to plaintiff's complaint was sustained and plaintiff elected not to plead further.

■ The sole question upon this appeal is whether plaintiff's complaint states a cause of action based upon strict liability. The relevant parts of plaintiff's complaint are as follows:

"* * * * *.

"III

"* * * [D]efendant was the owner of * * * property on N. W. St. Helen's Road, Portland, Oregon, whereon it maintained * * * storage units wherein it collected and controlled large amounts of natural gas.

"IV

"* * * said commodity was capable of great harm if it escaped from control.

"V

"* * * [P]laintiff's decedent was on a portion of the property of the defendant away from

---

* Goodwin, J., resigned on December 19, 1969.

the aforementioned collection of gas, to-wit, the plaintiff's decedent was preparing to assist in insulating a part of a liquified [sic] gas storage tank then under construction   \*  \*  \*.

"VI

"A portion of the gas so collected escaped from the defendant's control and entered the aforesaid liquified [sic] gas storage tank, and then and there exploded, causing the death  \*  \*  \*.

"\*  \*  \*  \*  \*"

Plaintiff relies on the rule of *Rylands v. Fletcher*[1] and Restatement of Torts § 519. The modern version of the *Rylands v. Fletcher* type of strict liability is applicable in situations in which social policy requires the defendant to make good the harm which results to others from abnormal risks which are inherent in activities that are not considered blameworthy because they are reasonably incident to desirable industrial activity.[2] The basis of the liability is the intentional behavior in exposing the community to the abnormal risk.[3]

■■ The first question which arises in this case is whether defendant was engaged in an activity in which abnormal risks were inherent. Such an activity is spoken of as ultrahazardous or abnormally dangerous.[4] Whether an activity is abnormally dangerous is a question for the court.[5] It is our opinion that

[1] Fletcher v. Rylands, 3 H&C 774, 159 Eng Rep 737 (Ex 1865), reversed in Fletcher v. Rylands, LR 1 Ex 265 (1866), affirmed in Rylands v. Fletcher, LR 3 HL 330 (1868).

[2] 2 Harper and James, *The Law of Torts* 815-16, § 14.6 (1956).

[3] Loe et ux v. Lenhard et al, 227 Or 242, 251, 362 P2d 312, 317 (1961); Prosser, *Torts* 508, § 74 (3d ed 1964).

[4] For a discussion of the reason for the change from the use of the term "ultrahazardous" in Restatement, Torts, to "abnormally dangerous" in Restatement (Second) Torts, see Note to Institute, Nos. 1, 3, 4, § 520.

[5] Loe et ux v. Lenhard et al, *supra* at 249.

natural gas in vaporous form is sufficiently volatile to be capable of great harm and that the danger of explosion and/or fire from its storage in large quantities cannot be completely eliminated by the use of reasonable care. It is usually held that the storage of explosives in a settled area is abnormally dangerous. *See* Prosser, *Torts* 525, § 77 (3d ed 1964), and cases cited under footnotes 37 and 38. We view natural gas as being of the same nature as an explosive.

■■ The following Oregon cases have held a particular activity to be abnormally dangerous: *Loe et ux v. Lenhard et al*, 227 Or 242, 362 P2d 312 (1961), crop spraying with chemicals; *Bedell et ux v. Goulter et al*, 199 Or 344, 261 P2d 842 (1953), blasting; *Brown, Adm'x, v. Gessler et al*, 191 Or 503, 230 P2d 541, 23 ALR2d 815 (1951), accumulation of water. We have come to the conclusion that when an activity is extraordinary, exceptional, or unusual, considering the locality in which it is carried on; when there is a risk of grave harm from such abnormality; and when the risk cannot be eliminated by the exercise of reasonable care, the activity should be classed as abnormally dangerous. We find the storage of large amounts of natural gas in a populated area to be such an activity.

*Bedell et ux v. Goulter et al, supra,* contains language[1] to the effect that in a blasting case the character of the locality in which the blasting was carried on is not material. This language apparently was based on Restatement § 520. We agree with the change proposed in Restatement (Second) § 520 (e), which makes the locality in which the activity is carried on a relevant factor, and, therefore, we now disapprove

---

[1] Bedell et ux v. Goulter et al, 199 Or 344, 363, 261 P2d 842, 850 (1953).

of the language in *Bedell*. *Also see* a suggestion to this effect in *Loe et ux v. Lenhard et al, supra* at 251.

The trial judge ruled that the storage of natural gas is not abnormally dangerous (ultrahazardous) because if care is used, the risk of an explosion or a fire is minimal. We agree that miscarriage is not frequent, probably because a high degree of care is usually used and, therefore, the risk of some harm cannot be said to be great. However, when miscarriage does occur, it can be lethal. We rather suspect that a blending process goes on and that the risk of some harm may be less if the gravity of the possible harm is great enough. Harper and James recognize this in discussing liability for blasting:

> "Moreover, while harm to others is neither certain, nor, in many cases, probable, if a high degree of caution and diligence is employed, still there is an irreducible minimum of risk involved even when all precautions are taken, and the possible harm is of such a serious nature that sound social policy demands that the actor assume the risk." 2 Harper and James, *The Law of Torts* 814, § 14.6 (1956).

The incidence of harm must necessarily be relatively infrequent or it would be negligence to carry on the activity at all, despite its utility.

■ We believe the principal factor which brings the activity within the abnormally dangerous classification is not so much the frequency of miscarriage (although this may be important) as it is the creation of an additional risk to others which cannot be alleviated and which arises from the extraordinary, exceptional, or abnormal nature of the activity. There is no reason why defendant's activity should not pay the cost of the additional risk of harm to others which arises from the activity's unusual nature. It is a risk which does

not result from customary industrial activity. It is not a normal risk which is mutually created and borne by all.

The establishment of exact criteria for determining whether an activity comes within the abnormally dangerous classification has its limits. A decision concerning who should bear the burden of the risks inherent in an activity involves a balancing of many conflicting interests. Such a weighing process does not easily lend itself to an exact formula. The following quotation from J. Faust, Jr., *Strict Liability in Landowner Cases,* 42 Or L Rev 273, 288-89 (1963), is appropriate:

> "It is submitted that the court's classification of an activity as extrahazardous is not determined solely by a measurement of the degree of the risk involved. Common sense indicates that this classification cannot depend entirely on the quantum of risk any more than a classification of an intrusion as trespassory can depend entirely on the physical character of the intrusion. The question is whether the plaintiff or the defendant should bear the burden of the risks inherent in the activity, and the answer to this question must necessarily involve a balancing of the conflicting interests of the litigants and the public."

Undoubtedly, another factor which enters the picture is the feeling that where one of two innocent persons must suffer, the loss should fall upon the one who created the risk causing the harm.

Defendant cites, for the proposition that natural gas is not abnormally dangerous, cases which involve the escape of gas from mains, pipes, and meters used in its distribution to customers. These cases can be distinguished on the basis that the distribution of gas

in mains and pipes in streets and houses is a matter of common usage. *See* Prosser, *Torts* 330, § 59 (2d ed 1955), and Comment *i*. Restatement (Second) § 520. Whether the cited cases were correctly decided or whether the distinction mentioned is valid is not of present concern because this is not a case of that kind. In any event, we believe the *storage* of large amounts of natural gas should be classed as an abnormally dangerous activity.

The concurring-dissenting opinion contends plaintiff should have to prove that defendant is engaged in an abnormally dangerous activity. We agree insofar as it holds that plaintiff must prove that defendant was in possession of a substantial quantity of natural gas in vaporous form upon its premises. We do not believe, however, the manner of its storage is relevant in determining whether it is abnormally dangerous. If there is a manner in which it can be stored with the safety of a usual industrial commodity in the locality in question, its storage is not an abnormally dangerous activity. The result of the ability to store it with such safety is that it would be negligence to store it in any other manner.

We also disagree that it is necessary for plaintiff to prove the propensities of natural gas in vaporous form. From available literature and general knowledge we became aware that natural gas in vaporous form is an explosive when mixed with air within certain proportional limits and subjected to heat or a spark. With this information in mind, we decided that its propensity to explode was sufficient to make its storage abnormally dangerous. This is not a case in which an activity is claimed to have been abnormally dangerous because of the manner in which a substance

is used or handled. We agree that natural gas in other than vaporous form may present an entirely different problem.

Defendant next contends that the *Rylands v. Fletcher* type of absolute liability is not applicable because neither the stored gas nor the force of its explosion escaped from defendant's premises. This contention raises a problem on which there is very little law. All Oregon decisions applying *Rylands v. Fletcher* have been cases where there was a trespass on the premises of another. We have found only one case which discusses the subject in detail. It is the English case, *Read v. J. Lyons & Co., Ld.* [1947] AC 156 (1946). In this case, the plaintiff was a government munitions inspector who was conscripted for work upon the premises of the defendant, a munitions manufacturer. She was present on the premises when an explosion occurred, and was injured. The court held the doctrine of *Rylands v. Fletcher* did not apply because the effects of the blast which caused the injury did not escape from defendant's premises. *Also see E. I. Du Pont De Nemours & Co. v. Cudd,* 176 F2d 855, 860 (10th Cir 1949).

We can see no meaningful reason, in terms of the policies behind imposing strict liability, why, in all cases, liability should be limited to damage which occurs off a defendant's premises. *Read v. Lyons, supra,* does not offer such a reason. The basis of the liability is the creation of an abnormal risk. This risk can be present both on and off defendant's premises. There may be reasons why a plaintiff should not recover which revolve around the circumstances under which plaintiff happened to be upon defendant's premises. Such reasons are usually grouped under the doc-

trine of assumption of risk. However, we cannot say that in all instances plaintiff's presence on defendant's premises should prevent recovery without more. It does not appear that in all instances the boundaries of a defendant's premises are relevant to any reasons for applying or not applying absolute liability.

Mere proximity to the area of danger may or may not be greater in the case of one who is on the premises as compared with one who is not. A person who is off the premises may be only across the street from the explosion while a person on defendant's premises may be a half mile away from it. No relevant distinction which is applicable in all instances is discernible between a person who is one foot within the boundary of defendant's premises as compared with one who is one foot from defendant's premises.

■ Under certain circumstances, the existence of absolute liability to someone upon the premises for damage caused by the abnormally dangerous activity is recognized by Section 520C of the tentative draft of the Restatement (Second) of Torts. It provides as follows:

"A POSSESSOR OF LAND IS SUBJECT TO STRICT LIABILITY FOR HARM RESULTING FROM AN ABNORMALLY DANGEROUS ACTIVITY WHICH HE CARRIES ON UPON THE LAND, TO PERSONS COMING UPON THE LAND IN THE EXERCISE OF A PRIVILEGE, WHETHER DERIVED FROM HIS CONSENT OR OTHERWISE."

While the proposed draft recognizes that there are no cases which directly substantiate its position, it analogizes the situation to one in which a person is injured on defendant's premises as the result of an assault by a wild animal which is kept by defendant. While

we do not purport to hold that plaintiff's decedent comes within the purview of Section 520C, the section does illustrate that the authors of the Restatement (Second) are of the opinion that the lack of an escape of something related to the abnormally dangerous activity from defendant's premises is not an absolute bar to strict liability. We do not believe there should be any such all-encompassing limitation upon the *Rylands v. Fletcher* type of absolute liability as is contended for by defendant. To us, the presence of the injured party on or off the defendant's premises, without more, seems irrelevant to any basis for the application of such liability.

■ Defendant next contends that it is a public utility and, as such, is authorized by the state to store and distribute natural gas and, therefore, it is immune from absolute liability. It relies upon the type of case described in the following excerpt from Prosser, *Torts* 540-41, § 79 (3d ed 1964):

> "There are certain conditions under which conduct which would otherwise result in strict liability may be privileged. The most obvious one is that of a sanction given by statutory authority, or well defined local law. Within the limitations of the constitution, the legislature may authorize acts which involve a high degree of risk to others, and such authority amounts at least to a declaration that the acts are not anti-social, but desirable for the benefit of the community. In the absence of a provision expressly preserving the defendant's liability for any resulting damage, the courts have on occasion interpreted the statute as condoning the consequences in advance, and have refused to hold the defendant liable for doing what he was authorized to do * * *." (Footnotes omitted.)

Section 521 of the proposed draft of the Restatement

(Second) of Torts covers this type of situation and provides as follows:

"THERE IS NO STRICT LIABILITY FOR AN ABNORMALLY DANGEROUS ACTIVITY IF IT IS CARRIED ON IN PURSUANCE OF A PUBLIC DUTY IMPOSED UPON THE ACTOR, OR A FRANCHISE OR AUTHORITY CONFERRING LEGISLATIVE APPROVAL OF THE ACTIVITY."

The comment under the proposed section (after pointing out that *public officials* who are required to engage in an abnormally dangerous activity and *public carriers* who are required to transport abnormally dangerous substances are not subject to absolute liability) is as follows:

"*b*. Even where there is no duty to engage in the abnormally dangerous activity, the defendant may be protected from strict liability by a sanction conferred by the legislature, under circumstances such as to indicate approval of the activity sufficient to confer immunity. Normally this is the case when, under a franchise given to such a defendant as a common carrier, it is authorized but not required to accept dangerous commodities for transportation. It may likewise be the case where the legislature grants to a defendant authority to engage in an activity of the abnormally dangerous kind, as where, in wartime, a defendant is authorized to construct and operate a plant making explosives in an area of special danger.

"On the other hand, it is not every authorization or permission to engage in an activity which can be taken to confer immunity from strict liability, by giving such approval to the activity as to indicate an intent that the defendant shall not be liable. In the absence of special circumstances indicating such an intent, the normal interpretation of the act of the legislature in granting a franchise

> or authority to act in such a manner is that the defendant is authorized to proceed, but must be strictly responsible if the activity in fact results in harm to those in the vicinity."

The proposed section lends no aid to defendant's contention. We do not believe the fact that the state has authorized defendant to engage in the abnormally dangerous activity in question demonstrates any intention to predetermine where responsibility should lie in the case of a non-negligent miscarriage of the activity.

While it is not entirely clear, defendant also appears to contend that where regulations concerning the safe storage of gas are in effect, such regulations amount to a usurpation of the field by the state and demonstrate an intention that strict liability is not to be extended to the activity so regulated and that liability can be based only on the violation of a regulation.

If we assume there are such regulations (none, so far, have been pleaded), and, further, if we assume for argument's sake that their adoption demonstrates that the state intended to usurp a field of liability, it would seem to be only a usurpation of the field of liability which relates to the duty of care owed by the defendant to others. This is what the regulations are about. Such regulations merely tell us something about the duty that is owed, the violation of which would constitute fault. The liability we are concerned with here is not based upon the concept of the lack of care, *i.e.*, fault. Therefore, we do not see how the delineation of what constitutes fault for the proprietors of abnormally dangerous activities in any way indicates an intention to dictate the legal relations of

the parties in situations in which fault is irrelevant. Absolute liability presupposes there has been no violation of an acceptable standard of conduct.

Defendant also contends that plaintiff's complaint is insufficient to state a cause of action because it alleges that decedent was engaged in the construction of a gas tank upon defendant's premises when the explosion occurred. Defendant argues that under Restatement (Second) Torts § 523, decedent, as a matter of law, assumed the risk of explosion because he took part in the abnormally dangerous activity. The complaint does not disclose the circumstances under which decedent was working upon defendant's premises. Two possibilities exist: he could have been an employee of defendant or an employee of an independent contractor. Our treatment of the subject of assumption of risk presupposes that he could have been either.

Assumption of risk is presently the source of much controversy among courts and legal scholars. Harper and James contend that assumption of risk is duplicated in other more widely understood concepts, such as scope of defendant's duty or plaintiff's contributory negligence, and that the defense of assumption of risk should be abolished except in those instances where there is an actual express agreement by plaintiff to incur the risk and to relieve defendant of responsibility. 2 Harper and James, *The Law of Torts* 1191, § 21.8 (1956). In effect, their concept distributes everything that was formerly known as assumption of risk between no-duty upon defendant and contributory negligence on the part of plaintiff, with the exception of an express agreement to assume the risk and to hold defendant harmless. Other legal scholars dis-

agree that the concept should be limited to this extent.[7]

■ Disregarding terminology, whether the reason for not allowing plaintiff to recover is described as assumption of risk, no-duty on the part of defendant, or contributory negligence by decedent, all authorities would agree that before decedent's participation in the work will bar plaintiff's recovery, such participation must have been with the full realization by decedent of the risks which resulted in his death, and he must have voluntarily incurred them.[8] Plaintiff's complaint does not allege facts from which it must necessarily be concluded that decedent, with knowledge, voluntarily submitted himself to such risks. Such a conclusion does not have to be drawn just because decedent was working on defendant's premises in the furtherance of defendant's activity. Before knowledge and voluntariness will be inferred as a matter of law from decedent's actions in engaging in the work, the situation with which decedent was faced must have presented a more obvious and immediate danger than that which is disclosed by plaintiff's complaint. Even if we assume that this court will follow the Restatement (Second) rule which recognizes assumption of risk as a defense to strict liability, the questions of decedent's knowledge and voluntariness are still viable and outstanding in this case.

It can be argued that where what has been known as assumption of risk is actually a part of the question

---

[7] R. Keeton, *Assumption of Risk in Products Liability Cases,* 22 La L Rev 122 (1961); Prosser, *Torts* 452-56, § 67 (3d ed 1964).

[8] "The defense of assumption of risk is in fact quite narrowly confined and restricted by two requirements: first, that the plaintiff must know and understand the risk he is incurring, and second, that his choice to incur it must be entirely free and voluntary." Prosser, *Torts* 461, § 67 (3d ed 1964).

of whether a defendant owes a duty of care to a plaintiff, plaintiff must allege facts which negate any possibility that he consented to assuming the risk, because, otherwise, he has not shown that defendant owes him any duty of care. However, this argument would not appear to be appropriate in a strict liability case where liability is not based upon the breach of any duty of care owed by a defendant to a plaintiff. We believe that an orderly presentation of the issues would be brought about if a plaintiff is required to allege in his complaint the facts which show that he was injured as a result of coming within the ambit of the unusual risk created by the abnormally dangerous activity, and if a defendant, then, is given the burden to allege any facts which show that there is something about plaintiff's presence within the ambit of risk which makes it inappropriate for him to recover.

The judgment of the circuit court is reversed and the case is remanded for further proceedings.

McALLISTER, J., concurring in part; dissenting in part.

I agree with the majority that defendant's demurrer should have been overruled and that the judgment of the trial court must be reversed. I disagree, however, with the majority's holding that defendant, as a matter of law, was engaged in an abnormally dangerous activity.

In her complaint plaintiff has alleged that defendant was engaged in an ultra hazardous activity, which consisted of the maintenance of "certain facilities including pipes and storage units wherein it collected and controlled large amounts of natural gas." Since the only question before this court is the sufficiency of the complaint, we must hold for the plaintiff, if a

case of strict liability could be made out within the scope of the allegations of the complaint.

This holding, however, should not decide whether the doctrine of strict liability is applicable in this case. When the case is tried plaintiff should be required to prove that defendant was in fact engaged in an abnormally dangerous activity which caused the death of plaintiff's decedent. The decision is one for the court, but should be made on the basis of the evidence introduced by the plaintiff at the trial. As was said in *Loe et ux v. Lenhard et al,* 227 Or 242, 249, 362 P2d 312 (1961):

> "When a question of this character is presented, it is the duty of the court to decide as a matter of law whether a given activity, *in a given factual setting,* is or is not extra hazardous. * * *" (Emphasis added.)

Some of the characteristics of natural gas are within the realm of general knowledge or can be judicially noticed. Natural gas is lighter than air. It is composed principally of methane, which presents a fire and explosion hazard when exposed to heat or flame. Sax, *Dangerous Properties of Industrial Materials,* 976, 1025 (1963). Its explosive properties are described as follows in Bureau of Mines Information Circular No. 6009:

> "* * * Any combustible gas or vapor, when mixed with air or oxygen within certain limiting proportions, will explode on ignition. The violence of the explosion varies with respective proportions of air and gas, and with the degree of confinement of the mixture. For example: Mixtures of natural gas and air containing between 4.5 and 12 per cent natural gas will explode, or propagate flame throughout the mixture without the continual pres-

ence of the source of ignition that started the inflammation. * * *"

What cannot be so readily ascertained are the hazards of storage of this material in different forms and quantities. Legislative judgment has given no clear guidance. Congress has concluded that the *transmission* of natural gas in pipelines presents hazards requiring uniform federal safety legislation. 49 USCA §§ 1671-1684 (Natural Gas Pipeline Safety Act, August 12, 1968). The Oregon Public Utility Commissioner has adopted safety regulations governing the pipeline transmission and distribution of natural gas (Rule 24-005) and the storage of liquefied natural gas (Rule 24-006), but I have found none governing the storage of natural gas in its vapor form. If such rules exist they are, of course, a proper matter for judicial notice, and should be called to the trial court's attention if they would be of assistance in its determination of the legal issue.

Without information as to the exact nature of defendant's activity, and the circumstances under which it was carried on, the court cannot know that defendant was engaged as a matter of law in an abnormally dangerous activity. That should be a question for the trial court after hearing proof about defendant's activities and the characteristics of natural gas which might make its storage dangerous in the "given factual setting" established by the evidence.