Argued and submitted May 5, affirmed October 26, petition for rehearing denied November 30, 1982

KOOS et al,
*Respondents on review,*

*v.*

ROTH,
*Petitioner on review.*

(TC 50967, CA 18924, SC 28356)

652 P2d 1255

Paul D. Clayton, Eugene, argued the cause for petitioner on review. With him on the briefs was Luvaas, Cobb, Richards & Fraser, P.C., Eugene.

Dean M. Quick, Albany, argued the cause for respondents on review. With him on the brief was Weatherford, Thompson, Brickey & Powers, P.C., Albany.

Charles F. Adams and Richard S. Gleason, Portland, filed a brief for amicus curiae Industrial Forestry Association. With them on the brief was Stoel, Rives, Boley, Fraser and Wyse, Portland.

Donald A. Haagensen and Mildred J. Carmack, Portland, filed a brief for amici curiae Oregon Seed Council, Oregon Seed Trade Association, and Oregon Ryegrass Growers Association. With them on the brief were Ridgway K. Foley, Jr. and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

John R. Miller, Salem, filed a brief for amicus curiae Oregon Farm Bureau Federation.

Michael F. McClain, Corvallis, filed a brief for amicus curiae Field Burning Defense Committee in the Court of Appeals. With him on the brief was McClain & Brown, Corvallis.

Before Denecke, Chief Justice,* Lent, Linde, Tanzer, Peterson and Campbell, Justices.

LINDE, J.

---

* Denecke, C. J. retired June 30, 1982.

## LINDE, J.

We are called upon to decide whether a farmer who employs field burning as an agricultural technique is strictly liable to pay damages when the fire enters upon and destroys a neighbor's property, without any need to show that the field burning was conducted negligently. The Court of Appeals so held in a decision *in banc,* three judges dissenting, 55 Or App 12, 637 P2d 167 (1982), and the theoretical and practical importance of the issue led us to allow review.

The course of events is essentially undisputed. Defendant was engaged in the commercial production of grass seed on 55 leased acres in Linn County, near the I-5 interstate highway. After the grass seed was harvested, defendant and a crew of men equipped with mobile water tanks burned the field by setting fire to dry straw, having first plowed a protective strip around the perimeter. While defendant's field was being burned, plaintiffs' adjoining field caught fire, causing damage to real and personal property stipulated at $8,017. Although no one testified to seeing how the fire on plaintiffs' property started, the witnesses, mostly members of defendant's crew, agreed that probably a whirlwind carried burning material from defendant's field. The record shows that the fire also spread to other nearby property of persons not involved in this action.

Plaintiffs sued for damages on theories of trespass, negligence, and strict liability. At the conclusion of the trial, defendant moved for a directed verdict on the grounds that he would not be liable for an unintentional trespass unless his actions were either negligent or abnormally dangerous, that there was no evidence of negligence, and that agricultural field burning as conducted by defendant is not an abnormally dangerous activity. Plaintiffs moved for a directed verdict on their strict liability claim. The trial court denied plaintiffs' motion and directed a verdict for defendant on all counts.

On appeal, plaintiffs abandoned the negligence count and assigned as error only the denial of their motion for a directed verdict based on their strict liability theories of trespass and abnormally dangerous activity. Although

technically the assignment of error did not include the allowance of a directed verdict for defendant, the parties and the Court of Appeals treated the trial court's rulings as "two sides of one coin." 55 Or App at 14 n. 3. This follows when the decision whether an activity is abnormally dangerous or otherwise subject to strict liability is a legal characterization to be made by the judge, as was stated in *Loe v. Lenhardt,* 227 Or 242, 249, 362 P2d 312 (1961). It is not contended in this case that the determination depends on disputed evidence of specific events or circumstances requiring jury adjudication. The Court of Appeals proceeded to reject plaintiff's claim for strict liability for trespass as such, relying on statements in *Loe* and in *Hudson v. Peavey Oil Co.,* 279 Or 3, 566 P2d 175 (1977) that negated this theory at least with respect to substances released from defendant's land.[1] The court concluded, however, that the trespass resulted from an "ultra-hazardous" activity, defendant's field burning, and that therefore plaintiffs were entitled to a directed verdict for the stipulated damages. 55 Or App at 18.

## I. *Abnormally dangerous activities.*

The modern evolution of this form of strict liability in Oregon can be traced from *Bedell v. Goulter,* 199 Or 344,

---

[1] Plaintiff relied on *Martin v. Reynolds Metals Co.,* 221 Or 86, 342 P2d 790, *cert den* 362 US 918, 80 S Ct 672, 4 LEd2d 739 (1960), a decision imposing liability for harm caused by airborne chemical compounds, which stated:

"Since we hold that the intrusion in this case constituted a trespass it is immaterial whether the defendant's conduct was careless, wanton and willful or entirely free from fault."

221 Or at 102. In *Loe v. Lenhardt, supra,* 227 Or at 248, which approved the less absolute view of liability for trespass stated in the Restatement of Torts, the court treated the trespass in *Martin* as "intentional," perhaps meaning that not only defendant's act but the intrusion into another's property was intended. This use of "intent" may not avoid or resolve classic problems of liability for conduct undertaken with knowledge of its undesired but near certain consequences. *Cf. Furrer v. Talent Irrigation Dist.,* 258 Or 494, 513, 466 P2d 605 (1971), and *Reter v. Talent Irrigation Dist.,* 258 Or 140, 482 P2d 170 (1971). Nevertheless, *Hudson* reaffirmed the rule stated in *Loe.* 279 Or at 6-7. These decisions in effect treated "trespass" as describing the invasion of a landowner's interest rather than an actor's conduct giving rise to liability.

Under the theory stated in those cases, it is undisputed that incursion by fire can be a trespass on another's property, *see Martin v. Union Pacific Railroad,* 256 Or 563, 474 P2d 739 (1970). But it is not actionable unless the defendant "intended" the incursion to occur, or "knew or should have known" of its occurrence and neglected to prevent it, *Hudson,* 279 Or at 7, *citing Furrer* and *Reter,* or engaged in an abnormally hazardous activity.

361, 261 P2d 842 (1953), which took as its starting point that this state followed the rule of *Rylands v. Fletcher,* (1868) L.R., 3 H.L. 330, 1 Eng Rul Cas 236, with respect to damage done by the escape of stored water.[2] *Bedell* applied the rule to explosives, holding defendants strictly liable for a trespass when their blasting operations damaged a dwelling about 1500 feet away. Liability later was denied, however, when explosives caused harm uncharacteristic of their dangerousness, the death of mink frightened by the noise. *Gronn v. Rogers Construction, Inc.,* 221 Or 226, 350 P2d 1086 (1960). The blasting in those cases was intentional, but the mere storage of highly explosive gas vapors in a populated area sufficed to impose strict liability for wrongful death from a nonnegligent explosion. *McLane v. Northwest Natural Gas,* 255 Or 324, 467 P2d 635 (1970). In 1961, *Loe v. Lenhardt, supra,* found an "extra hazardous" activity in aerial cropdusting with a chemical defoliant which damaged a neighbor's crops, a decision followed in *Bella v. Aurora Air, Inc.,* 279 Or 13, 566 P2d 489 (1977).

Thus, after the acceptance of *Rylands v. Fletcher,* the activities giving rise to strict liability in modern Oregon cases have been the storage or use of explosive material and aerial spraying of destructive chemicals. How have the holdings been explained?

In *Bedell v. Goulter, supra,* the court adopted the reasoning of *Exner v. Sherman Power Co.,* 54 F2d 510 (2nd Cir 1931), quoting extensively from the opinion of Judge Augustus Hand in that case. The chief issue was not so much whether an explosion of dynamite, intentional or accidental, results in strict liability but whether the harm must result from the tangible impact of debris scattered by the explosion, and this court followed *Exner* to reject that distinction. Strict liability followed simply from the intrinsic dangerousness of explosives. Justice Lusk's extensive review of the cases quoted from *Exner:*

" 'When a person engages in such a dangerous activity, useful though it be, he becomes an insurer.' "

---

[2] *Bedell* relied on the assertion of that rule in *Brown v. Gessler,* 191 Or 503, 512, 230 P2d 541 (1951), which in turn only endorsed the same conclusion reached upon prior cases in *Ure v. United States,* 93 F Supp 779, 789-91 (D Or 1950), *rev'd on other grounds* 225 F2d 709, 711 (9th Cir 1955), although *Brown* itself held the doctrine inapplicable to the facts in that case.

" '* * * If damage is inflicted, there ordinarily is liability, in the absence of excuse. When, as here, the defendant, though without fault, has engaged in the perilous activity of storing large quantities of a dangerous explosive for use in his business, we think there is no justification for relieving it of liability, and that the owner of the business, rather than a third person who has no relation to the explosion, other than that of injury, should bear the loss.' "

199 Or at 352. The opinion then quoted, though it did not particularly rely on, Restatement of Torts § 520, which at that time defined an activity as "ultrahazardous" if it "(a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage." Only "common usage," but neither the particular location of the dangerous activity nor its social usefulness were factors in the rule:

"Considering the ultrahazardous character of the activity, we find no reason for making a distinction between the right of the owner of a dwelling house which is damaged by a blast set off in open country 2000 feet distant from his house, and the right of an owner of a skyscraper in a large city damaged by a blast set off on adjoining property; or for distinguishing between a single blast which demolishes a house, and a series of blasts continued over a long period of time which crack the foundations of a house and cause it to settle. In either case the ensuing loss should be considered the blaster's business."

199 Or at 363.

Loe v. Lenhardt, supra, followed the reasoning of Bedell to impose strict liability on aerial spraying of crops with destructive chemicals. It added to the analysis a substantive element of attention to legislative determinations concerning the dangerous activity and the procedural rule that the legal question of strict liability must be decided by the court. 227 Or at 250-253.

McLane v. Northwest Natural Gas, supra, in turn, amended the preceding explanations in three respects. Justice Holman's opinion made clear that the danger of an activity did not depend on the frequency with which it miscarries, though this could be an important indicator, and that the destructive effects of the activity need not

occur beyond the defendant's premises. Also, *McLane* disavowed the statement in *Bedell*, quoted above, that would disregard the place in which the activity is carried on, citing a proposed change in Restatement (Second) § 520 that "makes the locality in which the activity is carried on a relevant factor." The locality was said to be relevant to determining whether an activity is "extraordinary, exceptional, or unusual," 255 Or at 328-329. This was reaffirmed in *Reter v. Talent Irrigation District, supra* note 1, which denied strict liability under *Rylands* for underground seepage from an irrigation ditch. The court found that the activity of irrigation "can hardly be called 'exceptional, or unusual, considering the locality in which it is carried on.' " As a separate point, not tied to the locality, the court noted that the canals were relatively modest in size and that "the risk of serious harm created by the activity is minimal." 258 Or at 145.

In a subsequent case, *Nicolai v. Day,* 264 Or 354, 506 P2d 483 (1973), the court equated the older terms "extra hazardous" or "ultrahazardous" with the phrase "abnormally dangerous" employed in § 520 of the second Restatement of Torts, and it referred to the "factors" there proposed for determining whether an activity is "abnormally dangerous."[3] The holding was that the slide of a landfill from defendant's land upon plaintiff's land did not qualify for strict liability because the risk could have been eliminated by the exercise of reasonable care. 264 Or at 359. The reference to the revised Restatement formulation, however, in some respects diverged from this court's decisions.

---

[3] The factors are:

"(a) Whether the activity involves a high degree of risk of some harm to the person, land or chattels of others;

"(b) Whether the gravity of the harm which may result from it is likely to be great;

"(c) Whether the risk cannot be eliminated by the exercise of reasonable care;

"(d) Whether the activity is not a matter of common usage;

"(e) Whether the activity is inappropriate to the place where it is carried on; and

"(f) The value of the activity to the community."

Restatement (Second) of Torts, § 520 (Tent. Draft No. 10, Apr. 20, 1964), quoted in *Nicolai v. Day,* 264 Or at 358-59.

The change of phrasing from "extra hazardous" or "ultrahazardous" to "abnormally dangerous," though subtle, created an ambiguity. To what norm does "abnormally" refer? The older phrases kept the focus on the hazardous character of the activity, on its essentially irreducible potential for causing substantial harm. Like them, "abnormally dangerous" literally means extraordinarily dangerous, much more dangerous than other activities. But the newer phrase lends itself to invoking social as well as physical norms, as if it read "abnormal and dangerous activities," thereby mixing questions of cause and effect, or probabilities and magnitudes of harm in the natural world, with what may be called societal considerations, like the "factors" listed but not further discussed in *Nicolai v. Day, supra.*

The very concept of danger, risk, or hazard, as we observed in *Bella v. Aurora Air, Inc., supra,* combines the factual judgment that an act or event chances a particular result with the value judgment that this result is in some important degree harmful. No one speaks of a "danger" of desirable or neutral consequences.

The probability of the harm is a fact in the natural world. The harm may or may not have an economic measure; the practice of compensating for personal injuries in money does not mean that the law tests the danger of such injury by the estimated compensation. While the physical probabilities may lend themselves to objective or "scientific" assessment, people may deeply disagree how much, if any, "harm" is represented even by a loss measurable in the marketplace, as many contemporary disputes over management of the natural environment show. But the nature of harm is not ordinarily an issue in the kind of injury to person or property for which one party seeks to recover damages from another, and it is not an issue here. The destruction of plaintiff's property was an actionable trespass, though unintended, if it resulted from an activity so dangerous as to give rise to strict liability, *see Hudson, supra, Martin v. Union Pacific Railroad, supra* note 1, and if the harm was of the kind whose potential occurrence made the activity dangerous, *Gronn v. Rogers Construction Co., supra.*

■ Whether the danger is so great as to give rise to strict liability depends both on the probability and on the magnitude of the threatened harm. If the consequences of a mishap are potentially lethal or highly destructive of health or property, a slight likelihood that they will occur suffices, *see McLane v. Northwest Natural Gas, supra,* 255 Or at 329, even if the harm in the actual occurrence is less severe. Conversely, we have held that even when the risk "only moderately threatens economic activities rather than harm to life, health, or property or environment," the activity may carry strict liability if the consequences are highly probable or, as stated in *Bella,* if the activity can be carried on "only with a substantially uncontrollable likelihood that the damage will sometimes occur." 279 Or at 24. Willingness to conduct an activity carrying a high probability of harm to others, however undesired, is what the *Loe* opinion described as "intentional" in explaining *Martin v. Reynolds Metals Co., see supra* note 1, where the likely harm to any person from the aerial dissemination of chemicals was moderately severe but substantially uncontrollable.

The assessment of extraordinary danger thus has been based on the magnitude of harmful events and their probability despite all reasonable precautions, as stated in the first three of the "factors" quoted in *Nicolai v. Day, supra* note 3. The role of societal criteria in our decisions is more doubtful. The opinions have made no clear distinction between the notions of "common usage" and of appropriateness of an activity to the location, nor whether "common usage" and "appropriate location" are identical, overlapping, or cumulative tests for escaping strict liability for highly dangerous activities. The test of common or uncommon usage has been recited to mean not only an activity that is widely carried on by many persons but also one that is accepted as natural or necessary by the inhabitants of the locality, like the irrigation ditches in *Reter v. Talent Irrigation District, supra* note 1, or the urban piping of gas mentioned in *McLane v. Northwest Natural Gas, supra,* 255 Or at 330-331. Likewise, a location may sometimes be called "appropriate" because the dangerous activity is useful or necessary, and sometimes because it is less likely to

cause extreme harm in that location.[4] The second meaning clarifies but adds nothing to the initial equation of danger.

The greater divergence from the "factors" quoted in *Nicolai v. Day,* concerns the value of the dangerous activity to the community. In the present case, defendant and amici curiae press upon us the economic importance of the grass seed industry, which makes extensive use of field burning, and of the forest products industry, which is concerned about the potential implications for its practices of burning slash and debris. This consideration, however, has not been a factor in this court's assessment of strict liability for abnormally dangerous activities. Instead, the court has looked to determinations and policies that may be found in legislative enactments.

■ There are at least two reasons not to judge civil liability for unintended harm by a court's views of the utility or value of the harmful activity. One reason lies in the nature of the judgment. Utility and value often are subjective and controversial. They will be judged differently by those who profit from an activity and those who are endangered by it, and between one locality and another. The use of explosives to remove old buildings for a new highway or shopping center may be described as slum clearance or as the destruction of historic landmarks and neighborhoods. On a smaller scale, it may celebrate a traditional holiday which some may value more highly than either buildings or roads. Highly toxic materials may be necessary to the production of agricultural pesticides, or of drugs, or of chemical or bacteriological weapons, or of industrial products of all sorts; does liability for injury from their storage or movement depend on the utility of these products? Judges, like others, may differ about such values; they can hardly be described as conclusions of law.

To rely on the evidence of the market place may show rather different societal values from those probably contemplated by Dean Prosser and the Restatement. While

---

[4] *See* Restatement (Second) of Torts § 520, Comment j (1977).

After *Rylands v. Fletcher,* similar complications arose from the decision to limit its reach by distinguishing "natural" and "non-natural" uses of land. *See Rickards v. Lothian,* [1913] A.C. 263, 16 C.L.R. 387 (P.C.); Stallybrass, *Dangerous Things and the Non-Natural User of Land,* 3 Cam L J 376 (1929).

some small airplanes enhance the production of food crops, others perhaps earn a larger return flying passengers or stunt exhibitions at the county fair. Entrepreneurs may bring more money into the local economy by racing automobiles or driving them to deliberate destruction than by operating a public transit system with a comparable incidence of actual injuries. If high risk itself has market value, does this count against strict liability for a resulting calamity? The addition of this "factor" in the second Restatement was the subject of some doubt and criticism during the debate of § 520 in the American Law Institute.[5] Our cases have not required courts and counsel to enter upon such philosophical issues in deciding whether a defendant is strictly liable for harm from a hazardous activity.[6]

The second reason why the value of a hazardous activity does not preclude strict liability for its consequences is that the conclusion does not follow from the premise. In the prior cases, the court did not question the economic value of blasting, cropdusting, or storing natural gas. In an action for damages, the question is not whether the activity threatens such harm that it should not be continued.[7] The question is who shall pay for harm that has been done. The loss has occurred. It is a cost of the activity whoever bears it. To say that when the activity has great economic value the cost should be borne by others is no more or less logical than to say that when the costs of an activity are borne by others it gains in value. This, in effect, is postulated in the argument that the industry

---

[5] See the remarks of Professors Fleming and Keeton and Mr. Buchanan in ALI, Proceedings 458-462 (1964). The Reporter, Dean Prosser, responded that he would like to "play this down" and "would be happy to throw it out, if I thought I could," but that in some cases, "Pennsylvania coal mines, western irrigation ditches, Texas oil wells are protected from strict liability. . . simply because of their importance to the community."

[6] *Compare Furrer v. Talent Irrig. Dist., supra* n. 1, 258 Or at 508-510, 466 P2d 605 (1971), for the role of utility in judging whether a defendant's conduct is negligent.

[7] Contrast the considerations taken into account before protecting plaintiffs by enjoining the harmful activity altogether, *York v. Stallings,* 217 Or 13, 341 P2d 529 (1959), perhaps because the chancellor had broader responsibilities in ordering or forbidding an activity than to adjudge an injured party's right to damages inflicted by another. *See also Phillips Ranch v. Banta,* 273 Or 784, 789, 543 P2d 1035 (1975).

which relies on field burning is highly valuable but could not survive the cost difference of insurance against strict liability instead of negligence.

Sometimes, moreover, the cost is borne by others engaged in the same or similar activity. That is true in this case, where plaintiffs and defendant farmed adjoining fields. The same can occur in cropdusting, in burning forest debris, or in the escape of stored water. If the accidentally impoverished neighbor is told that in the long run the losses will balance out, he may answer, like one economist, that in the long run we are all dead.[8] Society has other ways to lighten the burdens of costly but unavoidable accidents on a valued industry than to let them fall haphazardly on the industry's neighbors.

That, at least, has been this court's view of the common law in the absence of relevant legislation. We have already referred to the quotation in *Bedell* that one who engaged in the use of explosives, "useful though it be. . . becomes an insurer," and "that the owner of the business, rather than a third person who has no relation to the explosion, other than that of injury, should bear the loss." 199 Or at 352, quoting *Exner*. The person conducting the activity can choose whether or not to chance the potentially costly consequences. If he also owned the adjoining property, he might choose not to take the risk of fire, or blasting, or aerial spraying of toxic chemicals, with any degree of care. The potential victim cannot make that choice. Thus, as Justice Holman wrote in *McLane*, "where one of two innocent persons must suffer, the loss should fall upon the one who created the risk causing the harm." 255 Or at 330. Strict liability accompanies the decision to undertake the hazardous activity: "The element of fault, if it can be called that, lies in the deliberate choice by the defendant to inflict a high degree of risk upon his neighbor, even though utmost care is observed in so doing." *Loe v. Lenhardt, supra,* 227 Or at 251.

In sum, the focus in our cases has been on assessing abnormal hazards by their potential for harm of exceptional magnitude or probability despite the utmost

---

[8] Attributed to Keynes. Pigou, *John Maynard Keynes, 1883-1946,* 32 Proc. Brit. Acad. 395, 407 (1946).

care. This potential may, of course, differ with the place where the activity is conducted; but an activity is not otherwise immune from strict liability because it is "appropriate" in its place. If there is an appropriate location for aerial cropdusting, it is over open agricultural fields, as in *Loe* and *Bella.* As stated in *Loe,* however, "mere frequency of usage by specialists in a particular field [does not] determine whether or not the activity should pay its own way." 227 Or at 251. A danger that is only ordinary in an appropriate location may be abnormal where it exposes others to an extraordinary risk or magnitude of harm, but an extraordinary risk does not become ordinary because it occurs in its own appropriate place.

■ The societal qualification, rather, is that a dangerous activity is not an abnormal hazard, even though its intrinsic dangers cannot be prevented, if it is a "common usage." That term has been extended beyond its original meaning of widespread and accepted individual practice to embrace also essential service activities like the distribution of gas or electricity, *see McLane,* or irrigation water, as in *Reter,* though in the latter case there was the alternative ground that the court found small risk of serious harm. In other words, a dangerous activity is not extraordinarily so if nearly everyone routinely does it or expects to have it done for him.

■ Finally, the abnormally dangerous nature of an activity need not be proved by evidence if this danger is recognized by stringent legislative or administrative safety regulations, although it may be an issue what degree of danger a regulation recognizes. In *Loe,* the court noted that many states, including Oregon, strictly regulated the aerial application of herbicides or pesticides, concluding that "the dangerous character of aerial spraying has been recognized by those legislative assemblies which have given attention to the matter." 227 Or at 253. *Bella, supra,* likewise relied on a statute for the specific conclusion that spraying with the herbicide 2,4-D was abnormally dangerous. 279 Or at 24-25.

## II. *Fire as an abnormal hazard.*

■ The use of fire, of course, is the aboriginal "dangerous activity." Its relation to the rule of *Rylands v. Fletcher,* however, is more complicated.

It is an interesting question what the "common law of England" was in 1843, when this was adopted as the law in Oregon.[9] It should not be assumed that the common law demanded a showing of negligence to recover for losses from the spread of a fire intentionally set on another's property. The common law decisions were to the contrary, although exactly what rule of liability they established is disputed. An early common law action for letting one's fire escape and injure his neighbor is traced to the 1401 report of *Beaulieu v. Finglam,* Y.B. 2 Hen. IV. fo. 18, pl. 5. It applied equally to a fire set outdoors, for burning stubble in a field, as to fire in one's house.[10]

Wigmore treated this action as a form of absolute liability.[11] Winfield, upon more extensive investigation, disagreed, because the defendant was not liable if he showed that the fire was the act of a stranger, or an "act of God."[12] A modern study of the question agrees that negligence in the modern sense of the term was not required:

"Once it was established that the fire was *ignis suus* [*i.e.,* the defendant's fire], and that it had spread, the defendant was strictly liable for consequent damage to the plaintiff's property. It was not necessary to show that the defendant had been 'careless.' "[13]

---

[9] *See* Act of July 5, 1843, *reprinted in* Harris, *History of the Oregon Code,* 1 Or L Rev 129, 135 (1922); Act of June 27, 1844, Or L 1843-49 at 98, 100, art III, § 1. The modern analysis of strict liability began by recognizing Oregon's adoption of the common law. *Ure, supra* n. 2, 93 F Supp at 788.

[10] *Tubervill v. Stamp,* (1697) 1 Ld Raym. 264, 91 Eng Rep 1072, and 1 Salk, 91 Eng Rep 13. *Beaulieu v. Finglam* is translated in Fifoot, *History and Sources of the Common Law: Tort and Contract* 166 (1949).

[11] Wigmore, *Responsibility for Tortious Acts: Its History, III,* 7 Harv L Rev 441, 448-449 (1894).

[12] Winfield, *The Myth of Absolute Liability,* 42 LQR 37, 46 (1926); Winfield & Jolowicz on Tort 391-92 (9th ed 1971).

Liability of an owner on whose land a fire "accidentally" begins was excluded by a series of statutes beginning in 1707, Act 6 Anne ch 31, § 6, leading to a large English and Commonwealth jurisprudence on what is meant by "accidentally." Clerk & Lindsell on Torts, §§ 24-32 to 24-35 (15th ed 1982).

[13] Ogus, *Vagaries in Liability for the Escape of Fire,* 27 Camb L J 104, 105-106 (1969). The quotation continues:

" '*Negligenter*' can most helpfully be translated as 'by neglect' or 'by default.' As Holt C.J. is quoted as saying in one report of *Turbeville v. Stamp,* [*supra* n. 10] 'he must at his peril take care that it does not, through his neglect, injure his neighbors.' If there is a duty on a person to prevent his fire

In England, where *Rylands v. Fletcher* was decided soon after Oregon became a state, the doctrine of that case became another source of strict liability for escaping fire, in this case from a railway engine. *Jones v. Festiniog Ry.,* (1868) L.R., 3 Q.B. 733. Thus the old common law action and that under *Rylands v. Fletcher,* though not identical, became a matter of choice and perhaps tended to merge. *See* Winfield on Torts § 144 at 608-10 (6th ed 1954), Fleming, The Law of Torts 336-337 (5th ed 1977). In Australia and New Zealand, agricultural burning under conditions perhaps more like Oregon's than England's, has been tested by the standards of *Rylands v. Fletcher,* making cases turn on the concept of natural or unnatural uses of fire. *See* Sutton, *Liability for Escape of Fire,* 34 N Z L J 87 (1958), reviewing the cases.[14]

■　　　Meanwhile, in the states where strict liability under the *Rylands* doctrine was not adopted or developed, liability for fire damage was litigated under conventional negligence law. Many cases of fires set to clear land or for other agricultural purposes are included in an annotation that asserts "the general rule" that a person who sets a fire for a lawful purpose is not liable for damage on another's property unless he was negligent in starting or in controlling the fire. Annot., *Liability for Spread of Fire Purposely and Lawfully Kindled,* 24 ALR2d 241, 254, 295 (1952). The results then hinge on whether the fire was set under unreasonably dangerous conditions or with inadequate precautions against its spread. The prevalence of negligence liability for fire damage, however, does not settle the issue when a state's law includes strict liability for hazardous

---

escaping to his neighbor's land, and the fire does in fact escape, clearly he has been in 'neglect' of his duty."

(footnotes omitted.)

[14] *See also* Shiels, *New Zealand Forest Products Ltd. v. O'Sullivan,* 3 Otago L R 418 (1975).

While this appears not to be the general rule in Canada, it could have become the rule in so much of the disputed Oregon territory as might have become part of British Columbia. *See Gogo v. Eureka Sawmills, Ltd.* [1944] 3 WWR 268, [1944] 4 DLR 689 (Brit Col), *rev'd in part, on other grounds* 61 Brit Col 498, [1945] 4 DLR 127. *But see Tahsis Co. v. Canadian Forest Products, Ltd.* [1968] 65 WWR 641, 70 DLR2d 376, 389-92 (Brit Col); *Canadian Forest Products, Ltd. v. Hudson Lbr. Co.* [1959] 20 DLR2d 712, 727-31 (Brit Col).

activities under *Rylands v. Fletcher* or equivalent concepts. No prior decision has settled it in this state.[15] Liability for harm caused by the spread of an intentionally set fire therefore must be judged by the principles of the decisions reviewed above.

■ These principles do not lead to strict liability for the use of fire as such. The use must be abnormally dangerous, creating an effectively uncontrollable danger of serious harm beyond the ordinary risks associated with common uses of fire that are readily avoided by due care. It appears that field burning fits this description. It differs from other domestic and industrial uses of fire, including the spark-throwing steam locomotives whose incendiary propensities were a classic cost of industrial progress, because it is used specifically for destruction. Any fire means the destruction of raw material by oxidation, with attendant dangers; but in field burning, as in using explosives and herbicides, the same destruction that poses the danger to the user's neighbor is the user's very purpose. That alone does not make every backyard burner an abnormally dangerous activity. It is a matter of scale as well as location. When fire reaches the magnitude of burning essentially the whole surface of a large area open to the winds, the possibility that it will spread beyond its intended bounds cannot be excluded with any practical degree of care. In the trial court, witnesses gave varying testimony reflecting their personal experiences and estimates whether escape of a fire beyond the field intended to be burned is a highly unusual or a relatively common occurrence. The local fire chief testified that it occurred in perhaps one fire in eight, and he did not attribute this high percentage to lack of care. This uncontrollable potential of spreading is in principle like that of the aerial chemical sprays in *Loe* and *Bella,* as the Court of Appeals concluded.[16]

---

[15] When a fire has started as a result of defendant's negligence or spread as a result of defendant's careless handling of combustible materials, rather than being purposely set, negligence has been the test of liability. *See Comfort v. Stadelman,* 285 Or 525, 592 P2d 213 (1979), reviewing the cases.

[16] Judge Richardson, dissenting, believed that field burning is potentially more controllable than aerial cropdusting by precautions such as plowing perimeter strips, wetting fence lines, and having adequate fire fighting personnel and equipment on the scene, all of which the defendant did. Perhaps one can imagine

Also, as in those cases, the abnormal character of the danger is not negated because the field burning occurs in its appropriate location. Perhaps field burning is not much more exceptional in the location of defendant's field than irrigation ditches were in the location involved in *Reter,* but that was equally true of crop dusting. Field burning is not a "common usage" in the sense that it is an ordinary activity that many people routinely expect to do for themselves, like domestic fires, or to have done for them, like the distribution of water, gas, electricity and other common goods, as *McLane* suggests. Even in farming, field burning is not a generalized use, though widely employed for certain kinds of crops. It is an instance of the "frequency of usage by specialists in a particular field" which, according to *Loe,* does not determine "whether or not the activity should pay its way." 227 Or at 251.

### III. *Statutory policies.*

As already mentioned, a court need not determine whether an activity otherwise within the rule is exceptionally dangerous when legislators or their administrative delegates have recognized the danger by subjecting the activity to stringent safety regulations. Defendant and amici curiae make the opposite claim that statutory policy governing field burning precludes liability without fault for injuries caused by the burning.

Field burning legislation is found in ORS 468.450-468.495. ORS chapter 468 as a whole is concerned with pollution control. It assigns certain responsibilities for air pollution control to state and local administrative agencies, including the regulation and licensing of open field burning of grass and cereal grain crops. ORS 468.455 contains a legislative declaration that "limitation or bar of the practice at this time, without having found reasonable and economically feasible alternatives to the practice could seriously impair the public welfare." The section, however,

---

greater and costlier precautions that would effectively eliminate the risk, although when a few burning straws rising in the heat can be carried by the wind to ignite a distant field, it is not apparent what they would be. According to the testimony, defendant's precautions went beyond the customary standards and were found free from any negligence as a matter of law.

indisputably refers to field burning as a source of pollution. It declares the "public policy" to control the inevitable pollution by "smoke management" and research, "consistent with ORS 468.280." That section, in turn, states the general public policy to maintain air quality "as free from air pollution as is practicable, consistent with the overall public welfare of the state." These policy declarations have nothing to do with fire danger. They permit a polluting activity to continue, as far as state law is concerned, but they contain nothing to relieve it of the costs of harm to others. They do not preclude strict liability for injuries caused by field burning when this otherwise would apply.

Nor does the field burner's possession of the required permit preclude strict liability. Licenses, certificates, or permits are common devices in the regulation of dangerous activities, including the handling and use of explosives, dangerous gas, or chemical spraying involved in our prior cases of strict liability. *See* ORS 478.920(4) and 480.200 to 480.280 (explosives); ORS 480.432 to 480.436 (liquid petroleum gas); ORS 634.106 to 634.146 and 634.306 (pesticide operators and applicators). About the same argument, the court stated in *McLane:*

> "We do not believe the fact that the state has authorized defendant to engage in the abnormally dangerous activity in question demonstrates any intention to predetermine where responsibility should lie in the case of a non-negligent miscarriage of the activity."

255 Or at 336.[17] The court continued with the observation that compliance with safety regulations would not foreclose liability without fault, even if the regulations fixed the

---

[17] *McLane* quoted the distinction made in the Restatement between dangerous activities undertaken as a public duty or with special legislative sanction to conduct a hazardous but necessary task and merely authorized activities:

> "On the other hand, it is not every authorization or permission to engage in an activity which can be taken to confer immunity from strict liability, by giving such approval to the activity as to indicate an intent that the defendant shall not be liable. In the absence of special circumstances indicating such an intent, the normal interpretation of the act of the legislature in granting a franchise or authority to act in such a manner is that the defendant is authorized to proceed, but must be strictly responsible if the activity in fact results in harm to those in the vicinity."

Restatement (Second) of Torts (Draft, *supra* n. 3) § 521, comment *b,* quoted in 255 Or at 335-36. *See* now Restatement (Second) of Torts § 517, comment *d* (1977).

standard of due care for liability based on negligence. Here, as in *McLane*, defendant's activity was legal and conducted with governmental approval, but that approval does not predetermine civil responsibility in case of a non-negligent miscarriage of the activity.

 Plaintiff, in turn, points to the extensive regulations that address the incendiary rather than the polluting propensities of fire to establish its hazardous character. We agree that these are the more pertinent laws to show how far lawmakers have treated open, outdoor fires as a source of exceptional risk. ORS chapters 476, 477, and 478 make extensive provisions for organizing and paying for the prevention, suppression, and investigation of fires. These are evidence of the importance that historically has been given to the communal defense against the dangers of fire generally, not of a determination that some uses of fire are exceptionally dangerous. Some statutes impose special obligations with respect to particular kinds or locations of fire. ORS chapter 477, for instance, is devoted to fire protection on forest, grazing, and rangeland and contains provisions for regulation, *e.g.* ORS 477.515, 477.575, 477.625, and liability for double damages for fire losses caused negligently, wilfully, or maliciously, ORS 477.090. The statutory regime for forest, grazing, and rangeland is not involved in this case, and there is no occasion here to examine its implications for tort liability. Three statutes not limited to such lands may, however, be relevant.

Plaintiff cites ORS 477.740, which imposes criminal liability for unlawfully setting on fire "any grass, grain, stubble or other material being grown on any lands within the state" or failing to control the spread of fire from one's own land. The suggestion is not that the present defendant violated this statute but that the statute shows legislative recognition of the special danger of fires on open land.

Two statutes, ORS 478.960, and ORS 476.380, place open burning, including field burning, within and outside rural fire protection districts under special controls. Subsection (1) of each statute forbids such burning without first securing permission respectively from the fire chief or from county officials and complying with the directions of

the fire chief. ORS 478.960(2) directs the district fire chief to "prescribe conditions upon which permission is granted and which are necessary to be observed in setting the fire and preventing it from spreading and endangering life or property or endangering the air resources of this state." The subsection also makes it the responsibility of the fire chief, deputy, or State Fire Marshal to deny permission for field burning, even when allowed by the Environmental Quality Commission, if the fire official thinks it necessary "to prevent danger to life or property from fire." Subsection (3) holds the person starting the fire responsible for "providing adequate protection to prevent injury to the person or property of another," and it prescribes that any escape of the fire or injury to the person or property of another "constitutes prima facie evidence that the burning was not safe." ORS 476.380 makes similar provisions for property not within a rural fire protection district.

The statute does not explain the relevance of this "prima facie evidence that the burning was not safe." One of the amici curiae suggests that it implies that a person starting the fire is liable only if "the burning was not safe," and that this negates strict liability. A clause about civil liability, however, more, likely would have used a familiar word such as "negligent," referring to the conduct of the burner, than "safe," which refers to the burning. This fire obviously proved unsafe, though not for lack of care. A standard that burning be "safe" is equally compatible with either theory of liability. It appears that the clause was enacted with a view, not to civil liability, but to sanctions for violations of the section. It originally provided that "the escape of fire and injury to the property of another. . . shall be prima facie evidence that the burning was not safe and was in violation of this section." ORS 478.960(2) (1955). This provision implies nothing about the standard for tort liability to the injured party in the absence of a violation. Moreover, in the later version governing open burning outside fire protection districts, ORS 476.380, the same provision is followed by the explicit statement that nothing in the section "(c) Relieves a person who has obtained permission to start a fire, or his agent, from legal liability for property damage resulting from the fire."

In adopting these statutes the legislature did not undertake to define or alter tort liability for property damage, any more than in adopting the regulations of crop dusting and chemical herbicides cited in *Loe v. Lenhardt* and *Bella v. Aurora Air, Inc.* As in those cases, what the statutes establish is legislative recognition that certain kinds of open fires pose an exceptional danger of spreading and causing injuries. Governments, of course, require precautions against many routine risks that fall short of the extraordinary or abnormally dangerous. If safety regulations and licensing or other permit requirements alone implied a finding of exceptional danger, strict liability would be the rule and negligence liability the exception in wide areas of contemporary life. Not all fires, though regulated in the interests of safety, are abnormally dangerous; moreover, even hazardous activities do not carry strict liability for resulting harm if they are common usage. Whether a regulatory scheme reflects recognition of extraordinary danger must be judged for each particular scheme.

We have described the exceptional controls imposed upon open field burning, with their requirement of individual permits in the light of daily conditions and of on-the-scene precautions to deal with a spread of the fire if it occurs. These statutory provisions reinforce the conclusion of the Court of Appeals that field burning fits this court's criteria of an abnormally dangerous activity. The spread of the fire from defendant's field to plaintiffs' land therefore was a trespass making defendant liable for the damage done to their property.

The decision of the Court of Appeals is affirmed.