**INDIANA HARBOR BELT RAILROAD COMPANY, Plaintiff,**

v.

**AMERICAN CYANAMID COMPANY and Missouri Pacific Railroad Company, Defendants.**

No. 80 C 1857.

United States District Court, N.D. Illinois, E.D.

June 3, 1987.

Anna M. Kelly, Indiana Harbor Belt R. Co., Chicago, Ill., for plaintiff.

Thomas A. Allen, Ann C. Petersen, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

En route from one of defendant American Cyanamid Company's (Cyanamid) plants to another, a railroad tank car filled with acrylonitrile, a flammable and toxic liquid chemical, sprang a leak. Between 2,000 and 4,000 gallons of the chemical spilled out in plaintiff Indiana Harbor Belt Railroad's (IHB) Blue Island freight yard in the Chicago suburbs. The spill forced the temporary evacuation of about 3,000 people. It also contaminated not only the ground, but also the water beneath it, thus threatening the water supply for nearby Calumet Park, Riverdale and other communities.

Simply put, this lawsuit exists because Cyanamid does not want to reimburse IHB for the nearly $1 million in cleanup costs for that chemical spill. IHB's motion for summary judgment, which is now before the court, asks us to find that transporting acrylonitrile is an abnormally dangerous activity for which Cyanamid is strictly liable. Determination of whether or not an activity is abnormally dangerous requires a consideration of several factors, but Illinois law, following 3 *Restatement (Second) of Torts* § 520 (1977), puts heavy emphasis on the relationship between the activity and the place where it is carried on. We need not decide that shipping acrylonitrile is at all times and places abnormally dangerous to decide this case; shipping it through the Chicago metropolitan area was, and IHB's motion is granted.

## FACTS

Acrylonitrile is a chemical with a number of commercial uses, notably as the raw material for the acrylic fibers used in many types of clothing. On January 2, 1979, Cyanamid loaded some 20,000 gallons of acrylonitrile into its car NATX 22779 for shipment from its plant at Avondale, Louisiana to its plant at Warners, New Jersey. Cyanamid leased car NATX 22779 from North American Car Corporation. Under the terms of the lease Cyanamid had the responsibility of inspecting the car for defects or damage, and either making running repairs or returning the car to North American for repairs.

The Missouri Pacific Railroad (MoPac) picked up the car on January 3 and carried it to the Chicago area, after which it was scheduled to make the rest of its trip via Conrail. Apparently the MoPac and Conrail lines do not directly intersect. In any case, under an arrangement worked out in 1969, MoPac leaves cars slated for pickup by Conrail on the tracks of the IHB in its Blue Island yard. The IHB does not actually handle the cars; Conrail comes on to the IHB tracks to move the cars on to its own lines. However, the IHB collects a small fee for the use of its tracks. A MoPac engine and crew left the train containing car NATX 22779 on IHB track no. 7 on January 9, 1979 at about 8:40 a.m. IHB was notified that 27 cars in the 91–car train contained flammable materials, and received a consist describing the contents of each of those cars. A routine walking in-

spection of the train by IHB employees revealed no problems.

NATX 22779 has both top and bottom outlets. The bottom outlet consists of a reducer pipe, plug and outlet cap, with the cap attached to the car by a chain. The plug and cap do not, however, necessarily play a major role in holding liquids inside the car. Rather, that job falls at least equally to the bottom outlet valve, which is opened and closed with a turning device located inside a box on top of the car.

At about 12:30 p.m. on January 9, two IHB employees noticed a substantial flow of liquid coming out of the bottom outlet of NATX 22779. On closer inspection, they saw that the reducer had completely broken off at the point where it narrows from about 8 inches in diameter to about 5 inches. The bottom portion of the reducer, and the plug and cap assembly, were dangling from the car on the chain attached to the cap. The two employees briefly attempted to stop the flow by replacing the cap, but failed. IHB worker safety regulations prohibited climbing on top of the car to gain access to the valve control since no. 7 was a live track. The Riverdale Fire Department, when notified of the leak, ordered the car cut out of the train and moved to a siding.

Once that was accomplished, IHB workers attempted to stop the leak by going on top of the car to close the bottom outlet valve. Cyanamid had sealed the box covering the valve control upon loading the car, and that seal was unbroken. Nevertheless, on opening the box, the workers found the valve open, one nut missing from the control mechanism and the other nut loose, bolts missing, and a loose packing gland. It took about a 180 degree turn of the wheel to close the valve, after which the leak stopped. Later inspections revealed that the valve rod was out of position and had play in it, and that a cotter pin was missing. Plugs for two other valves were either missing or loose. As for the bottom outlet itself, the reducer proved to have been welded at some time, and the assembly had broken at the point of the weld. These discoveries provided evidence which could explain how the car could start leaking while sitting in the yard. The bottom outlet valve could either have been left open or have worked its way open during shipment. The downward pressure of 20,-000 gallons of liquid on the outlet cap then would have eventually proved too much for the weld at some point. Such pressure could have broken the outlet cap assembly whether the car was moving or standing still.

Acrylonitrile is a highly flammable, poisonous liquid which is also toxic when inhaled. *See Hebel v. Conrail, Inc.*, 475 N.E.2d 652, 655 (Ind.1985). Either ingestion or inhalation can cause cancer. 29 C.F.R. § 1910.1045(p); *Cullender v. BASF Wyandotte Corp.*, 146 Mich.App. 423, 381 N.W.2d 737, 739 (1985). Applicable Department of Transportation regulations vigorously restrict its shipment. For example, while air cargo flights may carry ten gallons of gasoline, they may carry only one quart of acrylonitrile. Acrylonitrile has a flash point of 30 degrees F, meaning that at a temperature of 30 degrees or above it "will quickly evaporate and form a combustible mixture which will ignite in a flash if brought into contact with a spark." *Ruggeri v. Minnesota Mining & Manufacturing Co.*, 63 Ill.App.3d 525, 527–528, 380 N.E.2d 445, 447, 20 Ill.Dec. 467, 469 (5th Dist.1978) (describing flash point of an adhesive liquid). When working on the tank car to stop the leak, IHB personnel used brass tools to avoid sparking.

The Illinois Environmental Protection Agency considers any concentration of acrylonitrile over 10 ppm in soil or ground water to be highly unsafe. Initial readings taken in the ground water beneath the IHB yard indicated a concentration of 8,000 ppm. Cleanup thus required pumping out the ground water and replacing it. Documents IHB submits indicate that it spent $981,022.75 on cleanup.

## DISCUSSION

### I. Negligence and Strict Liability

IHB's complaint includes both a negligence and a strict liability count against Cyanamid. *Indiana Harbor Belt*

*Railroad v. American Cyanamid Co.*, 517 F.Supp. 314, 315 (N.D.Ill.1981). This court cannot help but wonder why IHB does not assert its negligence count for purposes of this motion. Summary judgment for a plaintiff in a negligence action is rare, but not impossible. One is liable in negligence for damages caused by failure to observe the standard of care which a reasonable prudent person would have taken. If the undisputed facts are such that no rational jury could find that the standard of care has been met, then summary judgment can and should be granted. *Marsden v. Patane*, 380 F.2d 489, 492–493 (5th Cir.1967).

■ On the surface, at least, IHB would appear to have a very solid claim for negligence against Cyanamid. The more dangerous the activity, the more care a person must take to be reasonable and prudent. *Nelson v. Commonwealth Edison Co.*, 124 Ill.App.3d 655, 667–668, 465 N.E.2d 513, 522–523, 80 Ill.Dec. 401, 410–411 (2d Dist. 1984); *German v. Illinois Power Co.*, 115 Ill.App.3d 977, 984–985, 451 N.E.2d 903, 908–909, 71 Ill.Dec. 749, 754–755 (5th Dist. 1983); *see also Krull v. Keene Corp.*, 601 F.Supp. 547 (N.D.Ill.1985). Obviously, acrylonitrile is a dangerous chemical. If it leaks out of its container it can explode, contaminate soil and water, and give off toxic fumes. Given the law of gravity, it is difficult to see how a reasonable and prudent manufacturer could ship it in a tank car with both a loose and defective bottom outlet valve control, and a pressure-bearing weld on the bottom outlet assembly.

Moreover, many of the parties' arguments address questions more relevant to a negligence action than to strict liability. IHB in its briefs reminds the court again and again of the poor condition of the car Cyanamid used for its acrylonitrile shipment, as if IHB needed to show that Cyanamid was at fault for the leak in the car. Cyanamid joins the battle on similar ground. Since we do not know exactly how the car came to be leaking, it contends, an issue of fact must exist about who is legally responsible for damage from the spill— as if the leak needs to be someone's fault before liability can be imposed. Cyanamid also argues that IHB should not recover the full amount of its damages because it failed to discover or stop the leak sooner than it did, as if the legal task here is comparing the degrees of negligence on each side.

■ However, IHB has chosen to move for summary judgment only on the strict liability count. For that theory of liability we do not ask who was at fault or in what proportion. Rather, we ask whether the defendant was engaging in an abnormally dangerous activity and whether the plaintiff's injury resulted from that activity. 3 *Restatement (Second) of Torts* § 519(1) (1977). The doctrine can be best understood by thinking of a situation where injury occurs and neither party is at fault. Ordinarily, in those circumstances the cost of the injury will remain with the injured party. But for certain activities with an inherent element of risk, the law imposes the burden of the loss on the person who undertook the dangerous activity and stands to profit from it. *Cyanamid*, 517 F.Supp. at 316–18. As Judge Augustus Hand commented some two generations ago, it is fairer to place the burden of the loss on the person who created the inordinate risk than on someone who has no relation to the activity other than an injury from it. *Exner v. Sherman Power Construction Co.*, 54 F.2d 510, 514 (2d Cir. 1931); *see, e.g., Langan v. Valicopters, Inc.*, 88 Wash.2d 855, 567 P.2d 218, 221 (1977).

■ Since the law does not impose liability because the defendant was negligent, but rather as a matter of public policy, fault does not matter. One who engages in an abnormally dangerous activity is liable for all injury resulting from the activity, period, regardless of who was at fault. The injury must, of course, be one of the kinds of harm which one expects given the dangerous nature of the activity. *Restatement*, § 519(2). If NATX 22779 had uncoupled from the train and run down an IHB yard worker, the harm would be the kind which any railroad car could cause, and strict liability would not apply simply because the car happened to contain acryl-

onitrile. But Cyanamid does not dispute that contamination of soil and water was one of the kinds of dangers posed by bringing this toxic chemical into the place of injury. *Cf. Department of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 468 A.2d 150, 160 (1983) (wastes from mercury processing plant contaminated land and water).

 Thus, for a liability determination, it does not matter whether the specific events which led to an injury in this particular instance stemmed from someone's negligence, a natural force like windstorm or flood, or even the acts of a wild animal. *Restatement,* § 522. The person who created the risk by engaging in the activity will be liable for the damage unless another party's deliberate act intervened to break the chain of causation—and in some cases not even that will take the defendant off the hook. *See, e.g., Ashland Oil, Inc. v. Miller Oil Purchasing Co.*, 678 F.2d 1293, 1308 (5th Cir.1982); *Galbreath v. Engineering Construction Corp.*, 149 Ind. App. 347, 355–359, 273 N.E.2d 121, 127–128 (1971). The law imposes strict liability on him simply as a cost of engaging in that kind of business. *Restatement* § 519 comment d; *see, e.g., Mowrer v. Ashland Oil & Refining Co.*, 518 F.2d 659, 662 (7th Cir. 1975); *cf. Department of Highways v. Ray I. Jones Service Co.*, 475 P.2d 139, 142 (Okla.1970) (in return for state's grant of permit to operate oversize vehicle, grantee assumed strict liability for any damage to bridges from vehicle). How the car came to be leaking, and whose fault that was, is therefore not important for most of the analytical steps needed to decide this motion. Rather, we ask whether the activity Cyanamid undertook, transporting a volatile and toxic chemical, was dangerous enough that the law puts the burden of all losses resulting from it on Cyanamid as a matter of policy.

## II. Liability for an Abnormally Dangerous Activity

### A. The Restatement Standard

The principal question for this motion, therefore, is whether Illinois law would classify Cyanamid's shipment of acrylonitrile here an abnormally dangerous activity for which strict liability should be imposed. Since this court's decision that plaintiff at least stated a claim for strict liability, *Cyanamid,* 517 F.Supp. at 320, two recent decisions of the Illinois Appellate Courts have clarified Illinois law on abnormally dangerous activities. As we anticipated, *id.* at 319, these Illinois courts have adopted the approach of §§ 519–520 of the *Restatement (Second) of Torts. See Continental Building Corp. v. Union Oil Co.*, 152 Ill. App.3d 513, 516, 504 N.E.2d 787, 790, 105 Ill.Dec. 502, 505 (1st Dist.1987); *Fallon v. Indian Trail School*, 148 Ill. App.3d 931, 933, 500 N.E.2d 101, 102, 102 Ill.Dec. 479, 480 (2d Dist.1986).

 The *Fallon* court also has settled one problem relevant to the characterization of the activity here. IHB wants us to describe the activity as transporting acrylonitrile in a defective tank car, which description would of course make it that much easier for us to find Cyanamid's activity abnormally dangerous. However, at least in Illinois, it is the danger inherent in the activity at all times which matters. It must be "dangerous in its normal or nondefective state." 148 Ill.App.3d at 935, 500 N.E.2d at 103, 102 Ill.Dec. at 481. Thus IHB's evidence about the condition of the tank car is not relevant to a determination of whether the activity is abnormally dangerous. The issue here would be the same if the tank car had been upended by a tornado. *Restatement,* § 522(c). It is whether the shipment of acrylonitrile through the IHB yards near Riverdale is an abnormally dangerous activity, in the legal sense, so as to impose the risk of loss due to spillage upon the shipper rather than the landowner without the landowner being required to prove the shipper's negligence.

 The *Restatement (Second)* test for an abnormally dangerous activity involves a consideration of six factors:

(a) Existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

*Restatement,* § 520.[1] Cyanamid provides an extended list of reasons why it thinks transporting acrylonitrile by rail, if dangerous, is not abnormally so under the *Restatement* standard. In its opinion, the risk of harm is small and the likelihood of extensive injury is also low because the chemical can be transported safely with the exercise of reasonable care. Indeed, millions of gallons of it are shipped safely every year, which in Cyanamid's lexicon makes the activity one of common usage. It also points forcefully to the many useful products made from acrylonitrile to contend that the activity of shipping it is valuable.

## B. An Activity Inappropriate to its Place

■ However, perhaps the single most important factor in determining whether or not an activity is abnormally dangerous is what the Restatement calls the "inappropriateness" of bringing the danger to the particular place where the damage occurred. *Continental,* 152 Ill.App.3d at 517, 504 N.E.2d at 790, 105 Ill.Dec. at 503; *Restatement,* § 520(e) and comment j; Note, *Strict Liability for Hazardous Enterprises: Returning to a Flexible Analysis,* 9 U.C.L.A.–Alaska L.Rev. 67, 76–78 (1979). "Inappropriate" here does not mean "negligent" or "wrong." Rather, it refers to an activity which, because of the nature of the locality in which it is carried on, is likely to cause substantially greater harm if an injury were to occur than it would cause somewhere else if a similar

injury were to occur. This emphasis on the relation of the activity to the locality harkens back to the original rule of *Rylands v. Fletcher,* [1868] L.R. 3 H.L. 330, 341; *see* W. Prosser, *Handbook of the Law of Torts* 505–506 (4th ed. 1971). An example in comment j to *Restatement* § 520 is illustrative and pertinent. Storage of large quantities of a highly inflammable liquid like gasoline is not abnormally dangerous in an uninhabited area, but the same activity can be abnormally dangerous in the midst of a heavily populated city. *Accord McLane v. Northwest Natural Gas Co.,* 255 Or. 324, 467 P.2d 635, 638 (1970) (storage of large amounts of natural gas in city abnormally dangerous).

Shipping acrylonitrile through the Chicago area is similar to activities which other jurisdictions have found abnormally dangerous. For example, storing hazardous chemicals in an urban area is an abnormally dangerous activity under New Jersey law, making the manufacturer of a chemical strictly liable for the cost of cleaning up spills. *Department of Environmental Protection v. Arlington Warehouse,* 203 N.J.Super. 9, 495 A.2d 882, 885 (App.Div. 1985). And the Washington Supreme Court has held that transporting gasoline by tanker truck through the state capital of Olympia is an abnormally dangerous activity. *Siegler v. Kuhlman,* 81 Wash.2d 448, 502 P.2d 1181, 1182, 1187 (1972), *cert. denied,* 411 U.S. 983, 93 S.Ct. 2275, 36 L.Ed.2d 959 (1973).

Cyanamid points out that the courts in *Ozark Industries, Inc. v. Stubbs Transports, Inc.,* 351 F.Supp. 351 (W.D.Ark. 1972), and *Collins v. Liquid Transporters,* 262 S.W.2d 382 (Ky.App.1953), did not impose strict liability for shipping gasoline by tanker truck. But in neither case is there an indication that the accident occurred in an urban area. Indeed, the plaintiff in *Ozark* sought to recover for damages to his trout farm. 351 F.Supp. at 352. Moreover, both of those decisions relied for their

1. Since some of Cyanamid's submissions appear to proceed as if the determination were a question of fact, we also note that whether an activity is abnormally dangerous is a question of law for the court. *See Fallon,* 148 Ill.App.3d at 934,

500 N.E.2d at 103, 102 Ill.Dec. at 481; *McLane v. Northwest Natural Gas Co.,* 255 Or. 324, 467 P.2d 635, 637 (1970); *Restatement,* § 520 comment 1.

standard on the first *Restatement of Torts* §§ 519–520 (1938). *Ozark*, 351 F.Supp. at 357; *Collins*, 262 S.W.2d at 382. The first *Restatement* did not expressly urge consideration of the relation of the activity to its surroundings. *Strict Liability, supra,* at 77–79. Also, it imposed strict liability only for "ultrahazardous" activities, those with a risk of serious harm "which cannot be eliminated by the exercise of the utmost care." § 520. The second *Restatement,* which was the standard in *Siegler,* 502 P.2d at 1187, applies strict liability to "abnormally dangerous" activities. An activity can be abnormally dangerous even though it could possibly be made safe. *Restatement (Second),* § 520 comment h; *Strict Liability, supra,* at 77. Thus neither *Ozark* nor *Collins* are useful guides to the current law of Illinois.

Illinois law recognizes the importance of the relationship between the activity and the place where it is maintained. *Continental,* 152 Ill.App.3d at 517–518, 504 N.E.2d at 790, 105 Ill.Dec. at 505. A distinction may turn on the character of the neighborhood within a city rather than the difference between city and country. The *Continental* court distinguished the storage of flammable chemicals in a district of factories and warehouses in Chicago from the same activity in or near a residential area. *Id.* at 518, 504 N.E.2d at 791, 105 Ill.Dec. at 506; *cf. Hudson v. Peavey Oil Co.,* 279 Or. 3, 566 P.2d 175, 178 (1977) (storage of gasoline by service station not abnormally dangerous in neighborhood with several service stations). Here, however, the IHB's Blue Island yard adjoined a residential area. Some 3,000 people had to leave their homes for a time after the spill. Cleanup costs were high because the spill contaminated the water supply for those and other nearby residents. Sending thousands of gallons of this toxic chemical through the Blue Island yard of the IHB seems singularly "inappropriate" in the *Restatement* sense of the word, given the character of the area surrounding that yard. *See Continental,* 152 Ill.App.3d at 517–518, 504 N.E.2d at 790–791, 105 Ill. Dec. at 505–506, *citing with approval Cyanamid,* 517 F.Supp. 314. The location

of the spill weighs heavily in favor of imposing strict liability here.

### C. Risk of Serious Harm

■ Shipping acrylonitrile also carries with it a substantial risk of serious harm. The parties dispute the extent to which that risk can be reduced or eliminated by the use of reasonable care. Cyanamid points to the large quantities of acrylonitrile which are transported by rail every year without incident. In an unusual twist, it also points to the evidence of the poor condition of the valve and outlet of NATX 22779, coming perilously close to admitting its own negligence in allowing the car to go out in that condition, in order to argue that this spill would not have occurred if reasonable care had been taken. The latter argument, however, partly misses the point. A defendant's own negligence hardly constitutes an affirmative defense to strict liability. *See Ashland Oil,* 678 F.2d at 1308, 1315 (defendants who negligently carried on an abnormally dangerous activity liable under both theories). Strict liability does allow a plaintiff to recover without proof of negligence, but it does not follow that a defendant can defeat a strict liability claim by proving negligence in the particular incident. If the activity was abnormally dangerous, he is strictly liable for the harm it caused regardless of whether he was negligent or not.

■ Whether or not this particular accident could have been prevented by reasonable care is not dispositive of whether or not shipping acrylonitrile is abnormally dangerous in its "normal or nondefective state" despite the exercise of reasonable care. The *Restatement* standard for risk of harm calls for a balancing test. § 520 comment g; *accord McLane,* 467 P.2d at 638. Cyanamid's evidence indicates that when reasonable care is employed in transporting acrylonitrile by rail, the likelihood of a spill is fairly small. It does not show that the risk of a spill can be eliminated, nor do we see how it could. Transportation of large quantities of anything involves some risk. *Siegler,* 502 P.2d at 1184, 1186. Derailments can occur despite the best of

care, for example, from a hidden defect or catastrophic weather. *Cf. id.* at 1187.

■ If a spill occurs, the potential for serious harm from acrylonitrile is very great, because it can do harm in so many different ways. It can explode or start a fire, injure anyone who inhales its fumes, or, as here, poison the soil and water. Indeed, the damage from this particular leak seems about as well contained as anyone could hope for in the circumstances. For example, no spark came to set off an explosion, or a fire that would have spread to the other 26 cars on the train containing flammable materials. When the potential for harm from any one occurrence is that great, unless the risk of an occurrence is almost nil, the activity presents a high degree of risk of serious harm. *McLane,* 467 P.2d at 638. Shipping acrylonitrile presents that kind of risk.

## D. Common Usage

■ Cyanamid also argues that shipping acrylonitrile is a matter of common usage because it occurs almost daily. That argument misunderstands the test. "Common usage" in this context depends not on the frequency with which the activity occurs, but rather on the number of people who take part in it. *New Meadows Holding Co. v. Washington Water Power Co.,* 102 Wash.2d 495, 687 P.2d 212, 216 (1984); *Restatement,* § 520 comment i.

In *New Meadows,* the Washington Supreme Court held that transmission of natural gas through underground pipelines is not an abnormally dangerous activity. The decision rested in part on the fact that the pipes were underground, "away from the dangers of the surface world." 687 P.2d at 217. But the court also noted that those lines run to the homes of some 160 million people nationwide who use the gas for heat and cooking. The activity is a matter of common usage. *Id.* at 216. In *Siegler,* 502 P.2d 1181, the same court had held that hauling gasoline by tanker truck through the city is abnormally dangerous. In distinguishing *Siegler,* the *New Meadows* court illustrated the meaning of "common usage." 687 P.2d at 216–217. Though mil-

lions use gasoline, they do not all haul it in commercial quantities. *See Zero Wholesale Gas Co. v. Stroud,* 264 Ark. 27, 571 S.W.2d 74, 77 (1978) (use of propane gas may be common, but delivery of large quantity of it to gas storage yard not a matter of common usage); *Restatement,* § 520 comment i (contrasting electricity running to and in residential wiring, a matter of common usage, with its transmission through high tension power lines, which is not). Very few persons ship 20,000 gallons of acrylonitrile by tank car. Such a shipment is not a matter of common usage.

## E. Value to the Community

■ Finally, Cyanamid contends that the value of shipping acrylonitrile outweighs its dangerous propensities. It submits examples of the product's many uses, from plastics to shirts and socks woven in part with acrylic fibers. Again, however, the argument is off the mark. The "value to the community" factor exists to allow for different standards in different regions and communities, depending on the relation of the activity to local prosperity. *Restatement,* § 520 comment k. To some extent this factor is merely a different application of the principles underlying the "appropriateness to the area" and "common usage" factors. For example, a large reservoir of water is more likely to be found abnormally dangerous in green and pleasant England than in dry and dusty West Texas cattle country. *Id.* Similarly, a court is unlikely to decide that cement manufacturing is abnormally dangerous in a particular town if it knows that a cement plant is the only industry in the town. *Id.*

Similar considerations may account for the difference between the law of Louisiana on liability for chemical spills, which Cyanamid has urged us to adopt, and the law of most other jurisdictions. Neither transporting nor disposing of toxic chemicals is an abnormally dangerous activity there, according to recent decisions. *See, e.g., Hawkins v. Evans Cooperage Co.,* 766 F.2d 904 (5th Cir.1985); *Ewell v. Petro Processors of Louisiana, Inc.,* 364 So.2d 604 (La.App.1978), *cert. denied,* 366 So.2d

575 (La.1979).[2] We are aware, however, that chemical plants such as Cyanamid's in Avondale play an important role in Louisiana's economy.[3] In any event, what one considers is the value of the activity not nationwide, but to the specific community or area damaged by it. The argument might have relevance if the spill had occurred before NATX 22779 had left Louisiana, but it has none here. The value of acrylonitrile did not outweigh the risk of serious harm to the people of Blue Island, Calumet Park and Riverdale.

 We therefore hold that Illinois law would impose strict liability for injuries resulting from the transportation of acrylonitrile in bulk through a Chicago residential area. Under the *Restatement* approach, all the factors need not be present in a particular case to find an activity abnormally dangerous. § 520 comment f. Nevertheless, we find all of them implicated here. Cyanamid's shipment posed a high degree of risk of serious harm to the persons, land and chattels in and around the IHB Blue Island yard, a risk which reasonable care could not eliminate. Shipping acrylonitrile is not a matter of common usage and not an activity of great value to Blue Island, Riverdale or Chicago. Above all, one who ships hazardous and toxic chemicals in large quantities through a densely populated area must be prepared to assume strict liability for any damage resulting from that shipment. Cyanamid was not negligent or "wrong" in choosing or acquiescing in a route through Chicago for its acrylonitrile shipment, but it is strictly liable for any damage caused by this abnormally dangerous activity.

## III. Causation and Plaintiff's Conduct

### A. The Scope of Cyanamid's Legal Responsibility

Cyanamid further resists a grant of summary judgment to IHB because in its opinion factual disputes still exist. It contends that IHB has not shown that Cyanamid's acts caused the leak. Perhaps, it says, MoPac, or IHB, or even a third party, did something to damage the car. But this argument misinterprets both the standard for Federal Rule of Civil Procedure 56 and the law of strict liability for abnormally dangerous activities. Only disputes over *material* facts—"facts that might affect the outcome of the suit under the governing law"—prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, ___, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The concerns Cyanamid expresses, even if they would constitute a genuine factual dispute (which they do not, as will be seen in part III-C below), do not affect the outcome.

IHB does not have to show that Cyanamid's conduct caused the leak in NATX 22779 to obtain summary judgment. It need only show that its injury resulted from Cyanamid's abnormally dangerous activity of shipping acrylonitrile. It has shown that it was harmed by a shipment of acrylonitrile sent by Cyanamid, which certainly seems to fit the ordinary meaning of the words "resulting from." At the very least, the nature of IHB's injury shifts the burden to Cyanamid to show that IHB's damages resulted from something else. *See, e.g., Blommer Chocolate Co. v. Bongards Creameries, Inc.*, 635 F.Supp. 911, 915–916 (N.D.Ill.1985), 635 F.Supp. 919, 927 (N.D.Ill.1986).

 As this court noted in part I of this opinion, once a determination is made that a defendant was engaging in an abnormally dangerous activity, that defendant can escape liability only under very narrow circumstances. Cyanamid's speculations about who caused the leak raise none of

---

**2.** The differences include a distinction in Louisiana law between "strict" liability for products cases and "absolute" liability for ultra-hazardous activities which Cyanamid urges on us. *See Kent v. Gulf States Utilities Co.*, 418 So.2d 493, 496–499 (La.1982). This court frankly is not sure that it follows the distinction. Elsewhere, strict liability and absolute liability are essentially synonyms. *See, e.g.*, 57 Am.Jur.2d, *Negligence*, § 111 (1971).

**3.** Alternatively, of course, the differences may be explained by the derivation of Louisiana law from the Code Napoleon. *See, e.g., Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1261 n. 34 (5th Cir.1985).

them. Because fault is irrelevant, a showing that some other party, or the plaintiff, was negligent in a way which contributed to the injury is also irrelevant, and will not defeat recovery. *Ashland Oil,* 678 F.2d at 1308; *Restatement,* §§ 522(a), 524(1). Indeed, reckless involvement of a third party is no defense. *Restatement,* § 522(a).

 Perhaps if Cyanamid could show that a third party intentionally damaged the car for the purpose of spilling acrylonitrile it would have a defense. But we have found no Illinois cases on that point, and intentional third party intervention is not a defense in all jurisdictions. *Restatement,* caveat to § 522. For example, in *Yukon Equipment, Inc. v. Fireman's Fund Insurance Co.,* 585 P.2d 1206, 1212 (Alaska 1978), thieves intentionally detonated a charge at a storage magazine for explosives, apparently to destroy evidence of their theft. A massive explosion followed, creating damage for miles around. Because keeping a storage magazine for explosives in that locality was abnormally dangerous, the magazine's owners were liable for the damage despite the intervention of the thieves. Proof that IHB intentionally broke open the outlet in order to damage its own property would constitute a defense. *See, e.g., Silkwood v. Kerr-McGee Corp.,* 667 F.2d 908, 921 (10th Cir.1981), *rev'd on other grounds,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). But we do not understand Cyanamid to suggest anything of that kind. In any case, there is no hint on this record of a deliberate assault on the car, by IHB or anyone else, and nothing less would excuse Cyanamid from strict liability. The causation questions Cyanamid raises do not prevent summary judgment.

**B. No IHB Conduct Constitutes a Defense to Strict Liability**

Cyanamid also contends that other factual questions relating to IHB's conduct exist. For example, there is some evidence that the car may have leaked slightly on its way into the yard. Cyanamid argues that IHB should not recover now because it might be able to show at trial that the defect in the car existed earlier and IHB failed to discover it. At least, says Cyanamid, IHB should not recover the full amount of its damages. A trier of fact might find that some of the consequences of the spill were avoidable if IHB had acted more quickly to stop the leak. Finally, it argues, on the basis of the notice of the contents of NATX 22779 to IHB, that IHB assumed the risk and cannot recover. All these are factual issues which in its opinion only a jury can resolve.

 However, again, the issues Cyanamid raises are not relevant to strict liability and so not material. In an action for strict liability in tort, the only kind of plaintiff's conduct which is relevant as a defense is conduct which could amount to an intervening or superseding proximate cause of the injury. Affirmative misuse or misconduct, or assumption of the risk, can reduce what a plaintiff can recover. Mere negligence, such as failure to discover or guard against a defect or a risk, cannot. *Coney v. J.L.G. Industries, Inc.,* 97 Ill.2d 104, 118–119, 454 N.E.2d 197, 204, 73 Ill. Dec. 337, 344 (1983); *Blommer Chocolate Co. v. Bongards Creameries, Inc.,* 644 F.Supp. 234, 237 (N.D.Ill.1986); *Restatement,* §§ 523 comment b, 524.

 For example, even taking the evidence which would support a preexisting leak as true, IHB's failure to discover that leak is no defense. Perhaps if Cyanamid could show that the car was gushing liquid when it came into the yard at the rate and volume it poured at 12:30, it would have a defense. But at most the evidence indicates occasional patches or drops, and that evidence is disputed. Failure to discover a leak of that size cannot constitute an intervening cause and so is no defense to strict liability as a matter of law. *Blommer,* 644 F.Supp. at 237–238.

The same principle applies to Cyanamid's avoidable consequences argument. A plaintiff's negligence will not reduce damages in a strict liability action, so IHB's conduct would have had to have been worse than that—reckless, perhaps, or willful and wanton. In fact, it would be very hard to call IHB's conduct even negligent

under the circumstances. Given acrylonitrile's volatility, a faster and perhaps unthinking response could well have made matters worse. Climbing on top of the car while it was on a live track would have endangered the worker who did so, and working on the valve before non-sparking brass tools could be fetched could have started a conflagration. Cutting the car out of the train, and away from the 26 other cars with flammable chemicals, before working on it seems a wise course. In any case, no rational jury could find reckless conduct here. There is no genuine issue.

## C. IHB Did Not Assume the Risk of a Defective Car

Finally, there is Cyanamid's assumption-of-risk argument. Superficially, this stance seems to have some appeal. The activity for which Cyanamid is strictly liable is shipping acrylonitrile, and thanks to the consist, IHB knew that the car contained acrylonitrile. However, the question is not that simple. The defense of assumption of risk is not favored in Illinois. *See, e.g., Barrett v. Fritz*, 42 Ill.2d 529, 248 N.E.2d 111 (1969); Kionka, *Implied Assumption of the Risk: Does it Survive Comparative Fault?* 1982 So.Ill.L.J. 371, 371. The plaintiff's acceptance of the risk must be both voluntary and knowing. *Reese v. Chicago Burlington & Quincy Railroad*, 55 Ill.2d 356, 360, 303 N.E.2d 382, 385 (1973); *Sipari v. Villa Olivia Country Club*, 63 Ill.App.3d 985, 991, 380 N.E.2d 819, 824, 20 Ill.Dec. 610, 615 (1st Dist.1978); *2 Restatement (Second) of Torts*, §§ 496A, 496D (1965). An act is only voluntary if one has a choice. IHB, as a common carrier, probably had no choice but to accept the shipment of acrylonitrile. *Cf. Restatement*, § 521.

▬▬▬ Moreover, when the claim is strict liability, assumption of the risk is defined in a manner consistent with the general principle that only a plaintiff who has helped to proximately cause his injury loses his chance to recover. By the standards of the *Restatement*, a strict liability plaintiff does not assume a particular risk

unless he both knows of its existence and appreciates its unreasonable character. Knowing that some danger exists is not enough. The plaintiff is ordinarily entitled to assume that the defendant has reduced the danger to a minimum by taking all reasonable precautions. If the defendant has not, the plaintiff's failure to discover or understand the true character of the danger, even if negligent, is not assumption of the risk. *Restatement*, §§ 496D and comment b, 523 comment f.

Illinois follows the *Restatement* rule. At strict liability, a plaintiff is barred from recovery only if he has knowingly and unreasonably exposed himself to the particular risk which caused his injury. *Thomas v. Kaiser Agricultural Chemicals*, 81 Ill.2d 206, 213–214, 407 N.E.2d 32, 36, 40 Ill.Dec. 801, 805 (1980); *Court v. Grzelinski*, 72 Ill.2d 141, 149, 379 N.E.2d 281, 284–285, 19 Ill.Dec. 617, 620–621 (1978); *Restatement*, § 523 comment c; *Kionka, supra*, at 393. Thus, for example, in *Court*, a fireman injured when a defective automobile gas tank exploded while he was attempting to extinguish the burning automobile, was not barred from recovering in strict liability by assumption of the risk. While by virtue of his occupation he had assumed the general risks common to firefighting, he had not knowingly consented to the risk of the specific defect in that automobile's gas tank. Similarly, in *Derrick v. Yoder Co.*, 88 Ill.App.3d 864, 869–872, 410 N.E.2d 1030, 1034–1035, 43 Ill.Dec. 897, 901–902 (1st Dist.1980), a worker who knew that a machine was dangerous in one respect had not knowingly assumed the risk of a different danger from the same machine.

Against an assumption of the risk argument, IHB's evidence on the condition of the bottom outlet valve assembly of car NATX 22779 finally becomes relevant. On this record, the specific risk which caused IHB's injury was not one of the risks associated with transporting acrylonitrile under ordinary circumstances, but rather the risk of transporting it in a defective tank car. There is no genuine issue that anything other than the condition of the valve assembly caused the car to leak. The valve control for the bottom outlet was sealed at

loading and still sealed at the time of the spill. When IHB broke the seal to stop the leak, the valve was both open and defectively assembled. The bottom outlet cap broke off at a point where the reducer had been welded. The spill occurred through the bottom outlet. Those facts constitute solid evidence that the spill occurred because of the condition of Cyanamid's car, regardless of the precise way in which both the valve and the cap came to be open. Cyanamid's mere speculation about what else might have happened does not constitute evidence that a genuine dispute exists which needs resolving. *See Anderson,* 477 U.S. at —, 106 S.Ct. at 2514; *Celotex Corp. v. Catrett,* 477 U.S. —, —, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, —, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Cyanamid has placed no facts on this record which would support an assumption of the risk defense. IHB knew that NATX 22779 contained acrylonitrile, but not that the car had a loose, defective bottom outlet valve, or that the car had a weld at a pressure-bearing spot on the outlet cover. Indeed, IHB could not have known of the difficulties with the valve, because the valve cover was sealed. Except in an emergency, only Cyanamid could break the seal. IHB was entitled to assume that Cyanamid had sent the car out in good condition. Since the poor condition of the car caused the spill, IHB did not assume the particular risk which caused its injury. Perhaps notice of the tank car's contents meant that IHB assumed the risk of the tank car being upended by a tornado, but that situation is not before us. No genuine material factual issue prevents a grant of summary judgment here.

## CONCLUSION

Plaintiff's motion for summary judgment against defendant American Cyanamid Company in the amount of $981,022.75 is granted.